Argued April 3, alternative writ dismissed June 27, 1978

# STATE ex rel ACADEMY PRESS, LTD.,
*Plaintiff-relator,*

*v.*

# BECKETT, *Defendant.*

## (SC 25517)

581 P2d 496

Thomas J. Peterson, of Butler, Husk & Gleaves, Eugene, argued the cause and filed the briefs for plaintiff-relator.

Stuart M. Brown, of Young, Horn, Cass & Scott, Eugene, argued the cause for defendant.

TONGUE, J.

Holman, J., concurring opinion.

Linde, J., concurring opinion.

## TONGUE, J.

This is a mandamus proceeding by Academy Press, Ltd., an Illinois corporation, to compel the trial court to quash the service made upon it under ORS 14.035, the Oregon "long-arm statute," in an action against it in the circuit court of Lane County by Jack Hart, a resident of that county.[1]

The motion to quash in the trial court was supported by the affidavit of Jordan Miller which alleged that:

"I am the vice president of defendant Academy Press, Ltd., an Illinois corporation with its principal place of business in the State of Illinois. Academy Press consists of two shareholders (my wife and I) and four employees.

"In September, 1975, I was contacted in Chicago, Illinois by Dominick Abel, a literary agent employed by plaintiff, Jack Hart, with an office in Chicago, Illinois. It was my first contact with Mr. Abel, and it was initiated by him. Prior to this, I had had no contacts with his principal, plaintiff Jack Hart.

"At our first meeting, Mr. Abel spoke to me about plaintiff and plaintiff's manuscript on the Los Angeles Times. This was followed the next day, September 17, 1975, with a letter from Mr. Abel to me, attached to this affidavit as Exhibit 'A' and by this reference expressly incorporated herein, in which Mr. Abel enclosed the manuscript on the Los Angeles Times.

---

[1] ORS 14.035 provides:

"(1) Any person, firm or corporation whether or not a citizen or a resident of this state, who, in person or through an agent, does any of the actions enumerated in this subsection, thereby submits such person and, if an individual, his personal representative to the jurisdiction of the courts of this state, as to any cause of action or suit or proceeding arising from any of the following:

"(a) The transaction of any business within this state;

"(b) The commission of a tortious act within this state;

"* * * * *

"(4) Only causes of action or suit or proceedings arising from acts enumerated in this section may be asserted against a defendant in an action or suit or proceeding in which jurisdiction over such defendant is based upon this section.

"* * * * *."

"A contract, dated November 10, 1975, was entered into between Academy Press and plaintiff. Negotiations concerning the terms of the contract took place in Illinois between Academy Press and plaintiff's agent Dominick Abel. I sent a proposed contract to Mr. Abel, who then made all of the handwritten changes in the contract. The contract was then signed by me and returned to Mr. Abel, together with a letter dated December 1, 1975, attached to this affidavit as Exhibit 'B' and by this reference expressly incorporated herein. Neither I nor anyone involved with Academy Press had met with, talked to, or written to plaintiff prior to or during the period of negotiations leading to the signing of the contract.

"Neither my wife nor I have ever been in Oregon. In addition to our Illinois contacts with plaintiff's agent Dominick Abel, plaintiff Jack Hart personally visited our office in Illinois on one occasion after the contract had been signed."[2]

In opposition to the motion of Academy Press to quash service of summons, the affidavit of Mr. Hart was also filed in the trial court, and alleged that:

"I entered into a contract for the publication of my history of the *Los Angeles Times* with Academy Press Limited by my signature in November, 1975, in Eugene, Oregon.

"After the signing of the contract agreement, I did extensive and time-consuming additional editing of the accepted manuscript. This work was done at the request and direction of Academy Press editors. (See Exhibits A through E.) These requested revisions were done from August, 1976 through February, 1977, and involved approximately 480 hours of labor. All of this work for Academy Press was done at their request and in Eugene, Oregon.

"In addition to this extended effort their inducements and encouragement in this period led me to believe that Academy Press would honor its commitment to publish my book. I therefore refrained from submitting my

---

[2] It also appears from correspondence attached to the opposing affidavit of Mr. Hart that Academy Press had previously published only one book and was then in the process of publishing its second book.

manuscript to other publishers. Since Academy Press repudiated our contract, the manuscript has been submitted to other publishers, who have rejected it, citing as a reason another book on the same subject to be published this year. The significant delay on my part in reliance on Academy Press' promises has greatly increased the difficulty in obtaining a publisher."

The exhibits attached to that affidavit included a letter to Mr. Hart dated July 28, 1976, stating, among other things, that the manuscript was "dry and factual and needs livening up" and discussing some of the problems of editing the manuscript, but offering to "write you an official letter reaffirming our intention to publish"; a letter to Mr. Hart dated October 1, 1976, stating that an editor had been hired who would "get back to you on the revisions"; a letter dated October 18, 1976, from the new editor discussing "revisions of your first few chapters," to be done "sentence by sentence" including the "need to strive for compactness and flow," among other things; a further four-page letter dated January 10, 1977, from the editor discussing the need for further revision, and a final letter dated February 18, 1977, from the editor to Mr. Hart expressing dissatisfaction with the "very little progress" in the making of revisions, stating that another book was being published, using "much of your dissertation," so as to "undercut our market" and suggesting that Mr. Hart "should put the project aside."

The petition for an alternative writ of mandamus, as filed in this court, alleges that defendant Beckett, the trial judge, denied petitioner's motion to quash service of the complaint of Jack Hart which alleged two causes of action:

(1) "The contract action alleged that Hart and Academy Press entered into a written contract in Oregon, in which Academy Press promised to publish a book authored by Hart [tentatively titled "*The Story of the Los Angeles Times*"], that Hart fully performed, and that Academy Press refused to publish the book, to Hart's damage in the amount of $25,000."

(2) "The tort action alleged that, at the time the contract was entered into, Academy Press misrepresented to Hart that Academy Press would publish Hart's book within one year after delivery of a completed manuscript, to Hart's damage in the amount of $25,000, plus $10,000 punitive damages."[3]

The petition for an alternative writ of mandamus, as filed in this court, contends that the service of summons should have been quashed on the following grounds:

"(1) The first cause of action, in contract, did not arise out of the transaction of business within the State pursuant to ORS 14.035(1)(a).

"(2) The second cause of action, in tort, did not arise out of the commission of a tortious act within the State pursuant to ORS 14.035(1)(b).

"(3) The constitutional due process notions of fair play and substantial justice are violated by subjecting Relator to the jurisdiction of this State."

---

[3]The contract included the following provisions:

"* * * * *

"2. Within one year after the Author has delivered the manuscript in conformity with Paragraph 4, the Publisher shall publish the work at its own expense and in such style and manner and at such price as it deems suitable. However, in no event shall the Publisher be obligated to publish a work which in its opinion violates the right of privacy of any person or contains libelous, obscene or other unlawful matter. The Publisher shall not be responsible for delays caused by any circumstance beyond its control.

"* * * * *

"4. The Author will deliver has delivered one complete copy of the work, (to which Publisher has made may make certain additions and changes.) * * *."

The tort cause of action includes the following allegation:

"At the time the contract was signed, Defendant either knew that the promise to publish Plaintiff's book within the one year period after delivery of the completed manuscript was false, or made such promise recklessly, without knowledge of its truth or falsity. The promise was made with the intent that Plaintiff rely thereon. At all times mentioned, Plaintiff was ignorant of the falsity of the representations.

"* * * * *

"In reliance upon Defendant's misrepresentation, Plaintiff performed work on the book at Defendant's request, and refrained from offering the book to other publishers.

"* * * * *"

[ 706 ]

A demurrer to the alternative writ of mandamus was filed in this court on behalf of defendant Beckett, as well as an "alternative answer" including the following affirmative allegations:

"* * * * *

"II

"The contract, containing representations that the book would be published within one year, was presented to Jack Hart for acceptance in Oregon and Jack Hart accepted by signing the contract in Oregon.

"III

"Letters were sent by Plaintiff to Jack Hart, in Oregon, with the intent of causing Jack Hart to perform work on the book which was the subject of the contract, all for the pecuniary benefit of Plaintiff.

"IV

"The subject of the contract, a book, is a unique item. It was revised extensively at Plaintiff's request and to Plaintiff's specifications, involved unusual expenditure of labor by Jack Hart, and is not readily marketable elsewhere.

"V

"Substantial economic consequences have been caused within Oregon as a result of the contract and the subsequent letters sent by Plaintiff to Jack Hart. It was foreseeable to Plaintiff, at the time the contract was made and the subsequent letters were sent, that such subsequent economic consequences would occur. These economic consequences accrued to the detriment of Jack Hart and were incurred by him in reliance upon the representations of Plaintiff made in the contract and the letters subsequent thereto.

"VI

"Plaintiff is engaged in Interstate Commerce with regard to the solicitation of manuscripts and the distribution of published books.[4]

---

[4]It is to be noted, however, that no such facts were alleged in the complaint filed by Mr. Hart or in the affidavit filed by him in opposition to the motion of Academy Press to quash service of that complaint. Accordingly, that alleged fact was not before the trial court in its consideration of the motion to quash.

"VII

"The contacts existing between Plaintiff and the
State of Oregon with regard to this matter are sufficient
to allow assumption of personal jurisdiction over Plain-
tiff by the Lane County Circuit Court, pursuant to ORS
14.035(1)(a) and (1)(b).
"* * * * *."

*The contract cause of action.*

This court has previously held that in cases in
which the jurisdiction of the court rests upon service of
process on a defendant in another state under ORS
14.035 two questions are presented: (1) Does the case
fall within the terms of ORS 14.035? If so, (2) Does due
process permit an Oregon court, as a matter of con-
stitutional law, to obtain and exercise personal juris-
diction over the defendant in such a case? *State ex rel
Western Seed v. Campbell,* 250 Or 262, 270-72, 442 P2d
215 (1968); *Myers v. Brickwedel,* 259 Or 457, 460, 486
P2d 1286 (1971). That same analysis has been adopted
by decisions of the courts of Illinois from which the
Oregon long-arm statute was adopted in 1962. *See
Gray v. American Radiator & Standard Sanitary
Corp.,* 22 Ill 2d 432, 176 NE2d 761, 762-63 (1961);
*Kropp Forge Co. v. Jawitz,* 37 Ill App 2d 475, 186 NE2d
76, 77 (1962); *Koplin v. Thomas, Haab & Botts,* 73 Ill
App 2d 242, 219 NE2d 646, 648 (1966). *See also* Levin,
*The "Long-Arm" Statute and Products Liability,* 4 Will
LJ 331, 337 (1967). We have said that decisions by that
court interpreting the Illinois statute are "ordinarily
persuasive" in interpreting the identical provisions of
the Oregon statute. *State ex rel Western Seed v.
Campbell, supra* at 271.

██ Consistent with that view, this court has also
adopted the holding of the Illinois court in *Gray* (176
NE2d at 763) that this long-arm statute "contemplates
the exertion of jurisdiction over non-resident defend-
ants to the extent permitted by the due-process
clause." As stated in *State ex rel Western Seed v.
Campbell, supra,* at 271:

[ 708 ]

"* * * It is reasonable, therefore, to hold that a statute modeled after the Illinois statute should be interpreted in Oregon as broadly as constitutional due process will permit."

In deciding the first question (whether this case falls within the terms of ORS 14.035), the problem is again two-fold because the complaint alleges two separate causes of action: one in contract and one in tort.

For a cause of action in contract to come within the terms of the Oregon "long-arm" statute it is necessary that such a cause of action involve "the transaction of * * * business within this state" within the meaning of ORS 14.035(1)(a). Academy Press contends that the disposition of that question in this case is controlled by our decision in *Neptune Microfloc v. First Nat. Util.,* 261 Or 494, 495 P2d 263 (1972). The plaintiff in that case designed, manufactured and sold sewage treatment systems and components for such systems. Defendant operated a sewage treatment plant in Florida. That transaction was initiated by the plaintiff through its representative in Florida, who "presented" plaintiff's order form to defendant in Florida, where it was accepted by defendant. That order form was subsequently signed by plaintiff in Oregon. Defendant also mailed its purchase order to Oregon, where it was accepted by plaintiff. No representative of defendant was ever in Oregon in connection with the transaction and there was no evidence that it had previously engaged in any interstate transactions. The tubes were not fabricated until after the contract was made, but the record did not indicate whether they were custom-made to fill the order. Under those facts we held (at 497-98) that the defendant in that case did not transact business in Oregon; that it did not have sufficient "contacts" with Oregon and, therefore, was not subject to the jurisdiction of the Oregon courts.

If the transaction in this case were limited to the negotiation and execution of the contract between the

[ 709 ]

parties, we would hold, as in *Neptune,* that Academy Press did not engage in "the transaction of any business" in Oregon within the meaning of ORS 14.035(1)(a). As in *Neptune,* the transaction in this case was "initiated" by plaintiff's agent in another state; no representative of the defendant ever came to Oregon; and, insofar as it would appear from the terms of the contract, no goods were to be "custom-made" or "specially manufactured" to specifications of any purchase order. In other words, insofar as it appears from the terms of the contract, the manuscript had already been completed and delivered to Academy Press.[5] There was also no evidence in this case that either party had previously engaged in interstate transactions.

The transaction between the parties in this case, however, when considered as a whole, was not limited to the negotiation and execution of the contract, but extended to and included a series of subsequent requests, if not demands, by Academy Press that Mr. Hart make extensive editorial changes in his manuscript, as previously submitted, so as to make it acceptable to Academy Press, including "sentence by sentence" revisions of the first few chapters.[6] Whether or not Academy Press was entitled to insist upon these changes under the terms of the contract is not now before this court for decision. According to the affidavit of Mr. Hart, as previously set forth, he performed approximately 480 hours of labor in reference to these requests by Academy Press.

It is contended by Mr. Hart that in view of these facts Academy Press did engage in "the transaction of * * * business within this state" for the purposes of ORS 14.035(1)(a) and that the decision of this case is controlled by our previous decision in *State ex rel White Lbr. v. Sulmonetti,* 252 Or 121, 448 P2d 571

---

[5] For terms of the contract, *see* n.3, above.

[6] *See* letters attached to affidavit of Mr. Hart, as previously described.

(1968), in which this court recognized the doctrine of "economic consequences."

In *White* this court discussed the doctrine of "economic consequences" as a part of its discussion of whether, as a matter of constitutional due process, there had been sufficient "contacts" in Oregon by the defendant in that case so as to make it "fair" to require that he submit to the jurisdiction of the Oregon courts.

This court has adopted "fairness" as the test of whether, as a matter of constitutional due process, a nonresident can be required to litigate in Oregon, as stated by the Supreme Court of the United States in *International Shoe Company v. State of Washington,* 326 US 310, 316 (1945), as follows:

> "* * * due process requires only that in order to subject a defendant to a judgment in personam, if he be not present in the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'."

*See Wakeman v. Davis,* 271 Or 414, 416, 532 P2d 796 (1975); *State ex rel White Lbr. v. Sulmonetti, supra; Neptune Microfloc v. First Fla. Util., supra;* and *State ex rel Ware v. Hieber,* 267 Or 124, 515 P2d 721 (1973).

We have recognized, however, as stated in *Neptune* that:

> "* * * A standard so nebulous as 'fairness' obviously is of little or no assistance in predicting how the close cases will be decided until enough cases have been decided to outline the perimeter of 'fairness.' * * *"

In *White, supra,* in discussing the subsequent decisions by the Supreme Court of the United States in *McGee v. International Life Ins. Co.,* 355 US 220 (1957), and in *Hanson v. Denckla,* 357 US 235 (1958), we also said that:

> "From the *McGee* and *Hanson* cases, three criteria can be said to define the present outer limits of *in personam* jurisdiction based on a single act: First, the defendant must purposefully avail himself of the

privilege of acting in the forum state or of causing important consequences in that state. Second, the cause of action must arise from the consequences in the forum state of the defendant's activities. Finally, the activities of the defendant or the consequences of those activities must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. * * *"

We also note that in 1 Restatement of Conflict of Laws 2d (1971), "doing business" in a state is defined as follows in § 35, Comment *a*:

"Doing business is doing a series of similar acts for the purpose of thereby realizing pecuniary benefit, or otherwise accomplishing an object, or doing a single act for such purpose with the intention of thereby initiating a series of such acts."

In 1 Restatement, *supra*, § 37, the following rule is stated:

"A state has power to exercise judicial jurisdiction over an individual who causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of the effects and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable."

In a Reporter's Note under that section (at 161) numerous cases are cited in support of the proposition that:

"A state may usually exercise jurisdiction over one who has *intentionally* caused effects in the state by means of an act done outside the state as to causes of action arising from these effects. * * *" (Emphasis added)

*See also* Annot., 27 ALR3d 537 (1969), and Annot., 23 ALR3d 551 (1969).

■ In view of our commitment to interpret the Oregon long-arm statute "as broadly as constitutional due process will permit," and upon a consideration of this entire transaction, including not only the negotiation and execution by Academy Press of a contract with an Oregon resident, but the series of subsequent requests

or demands by it that the Oregon resident perform a substantial amount of additional work, and in such a manner as to satisfy its requirements for publication, we hold that Academy Press has engaged in "the transaction of * * * business within this state" for the purposes of ORS 14.035(1)(a); that it has had sufficient "minimum contacts" with this state so as not to offend "traditional notions of fair play" by subjecting it to the jurisdiction of the courts of this state and, more specifically, that the three "criteria" as restated in *White* are satisfied by the facts of this case.

■ As to the first of these three "criteria," we believe that even if Academy Press did not "purposely avail [itself] of the privilege of acting" in Oregon, it did, not only by the contract signed by it, but by the subsequent letters requiring "sentence by sentence" editorial revisions of Mr. Hart's manuscript, purposely "cause important consequences" in Oregon in that, according to Mr. Hart's affidavit, he was caused by those letters to perform 480 hours of work. It may be that 480 hours of work would not be an "important consequence" in a large commercial transaction between two large corporations. In our judgment, however, when the contract involved is one in which the party required to perform additional work is an individual, we believe that the measure of the "importance" of the consequences is the importance of the consequences to him as an individual. Judged by that standard, we also believe that 480 hours' work—the equivalent of twelve 40-hour weeks—is a sufficiently "important" consequence so as to satisfy this "criterion" of "due process."

The second "criterion," i.e., that "the cause of action must arise from the consequences in the forum state of the defendant's activities," is also satisfied in this case. Plaintiff's cause of action for breach of contract did not arise, according to plaintiff's allegations, until after the series of letters requiring editorial revisions, when defendant refused to publish the book, contrary

[ 713 ]

to provisions of the contract that it would do so within one year, if the contentions of Mr. Hart are correct.

We also believe that the facts of this case satisfy the third and final "criterion," i.e., that "the activities of the defendant *or the consequences of those activities* must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." In our opinion, for the same reasons that the "consequences" of defendant's activities were sufficiently "important" so as to satisfy the first "criterion," we also believe that the "consequences" of the activities of Academy Press, when taken as a whole, including the series of letters demanding "sentence by sentence" editorial revisions, provided a "substantial enough connection" with the state of Oregon so as to make the exercise of jurisdiction over Academy Press "reasonable."

For these reasons, we hold, as previously stated, that Academy Press has had sufficient "significant contacts" in this state so as not to offend "traditional notions of fair play and substantial justice" by requiring it to submit to the jurisdiction of the courts of this state.

We recognize that although the transaction in *White* involved "custom-made" lumber manufactured to the specifications of that defendant, a fact considered by this court (at 126) to be of importance,[7] the transaction in *White* was "initiated" by an out-of-state purchaser which was itself engaged in interstate commerce and that those additional facts are not present in this case. Nevertheless, we believe that upon consideration of the entire transaction in this case, including the series of letters demanding editorial revisions to satisfy the requirements of Academy Press, the three "criteria," as stated in *White,* were satisfied.

---

[7] *See also* Scoles, *Oregon Conflicts: Three Cases,* 49 Or L Rev 273, 276 (1970).

*The tort cause of action.*

The second cause of action as alleged in the complaint of Mr. Hart was that Academy Press misrepresented to Hart that it would publish Hart's book within one year after delivery of the completed manuscript.[8] Academy Press says that "this action must fail for lack of jurisdiction because it did not arise from 'the commission of a tortious act within this state.' "

It is contended by Academy Press that, as a general rule, the tortious *act* must occur in Oregon; that the only exception to this rule is in products liability cases, in which recovery may be had for *injury* occurring in Oregon from a tortious act (*e.g.,* negligent design or manufacture) committed elsewhere and that, in any event, no recovery can be had when the injury arises out of an isolated transaction. We disagree, at least under the facts of this case.

It has been held by this court that actionable fraud can consist of promises made with intent not to perform or with reckless disregard whether the promisor can or cannot perform. *Weiss v. Northwest Accept. Corp.,* 274 Or 343, 346, 546 P2d 1065 (1976).

In *Gray v. American Radiator & Standard Sanitary Corp., supra,* the leading Illinois case cited and relied upon by this court in *White,* it was held that:

> "The wrong in the case at bar did not originate in the conduct of a servant physically present here, but arose instead from acts performed at the place of manufacture. Only the consequences occurred in Illinois. It is well established, however, that in law the place of a wrong is where the last event takes place which is necessary to render the actor liable. * * *" (176 NE2d at 762)

In *BRS, Inc. v. Dickerson,* 278 Or 269, 563 P2d 723 (1977) (not a products liability case), it was also contended by the defendants that no tortious act was committed in Oregon for purposes of ORS 14.035(1)(b) because:

---

[8]For specific allegations, *see* n.3, above.

"* * * [T]he tort, if it was committed, was committed in the State of Arizona, and there was no tortious act committed within the State of Oregon, because the documents, the alleged guarantees, were signed in Arizona; the contracts were entered into in Arizona, and the defendants were never in Arizona from the time of entering into the agreement, through the present."

In rejecting that contention this court (at 274) relied upon *Murphy v. Erwin-Wasey, Inc.,* 460 F2d 661 (1st Cir 1972), which held:

"* * * Where a defendant knowingly sends into a state a false statement intending that it should there be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state. * * *"

*Cf. State ex rel Advanced Dictating v. Dale,* 269 Or 242, 247, 524 P2d 1404 (1974), a defamation action, also citing with approval the *Murphy* rule. *See also* 1 Restatement, Conflict of Laws, *supra,* § 37, and Reporter's Note at 161, and Annot., 24 ALR3d 532 (1969).

The facts of *BRS* are quite similar to those of this case. Plaintiff was an Oregon manufacturer of athletic equipment. Defendants were principals and officers of an Arizona corporation. Defendants were first contacted by a representative of plaintiff. Plaintiff and defendants entered into an agreement for purchase of equipment. Plaintiff contended that the contract was based upon a misrepresentation, namely, that personal guarantees given by the defendants were enforceable in Arizona (which apparently they were not). This court held that the Oregon trial court had jurisdiction under ORS 14.035(1)(b).

■ For the same reasons as in *BRS,* we hold that the allegations of misrepresentation as set forth in the second cause of action of the complaint of Mr. Hart were sufficient as an allegation of a cause of action arising from "the commission of a tortious act within this state," within the meaning of ORS 14.035(1)(b).

[ 716 ]

Upon application of the "fairness" test and the three "criteria," to be satisfied in the application of that test, we also hold that just as there were sufficient "contacts" in Oregon so as to satisfy that test for the first cause of action alleged in the complaint of Mr. Hart for breach of contract, so also were there sufficient "contacts" in Oregon so as to satisfy the requirements of constitutional due process for the second cause of action in tort, when the transaction is considered as a whole.

Again, as in the first cause of action in contract, among the most significant facts for the purposes of constitutional due process were the series of letters requiring "sentence by sentence" revisions of the manuscript. In that respect again the facts of this case are similar to those of *BRS* in which, following the execution of the guaranty agreements, defendants made a series of orders for athletic equipment, extending over a period of several months.[9]

■ An additional factor of some importance in this case is that here, as in *BRS,* Oregon has an interest in the application of its law for the protection of one of its residents who claims to have been the victim of a tort by the resident of another state. *See also Myers v. Brickwedel, supra* at 467, and 1 Restatement, Conflict of Laws, *supra,* § 36, Comment *c.*

For all of these reasons, we hold that the trial court did not err in denying the motion to quash by Academy

---

[9]We have not overlooked the contention by Academy Press that the first of these letters contains a "definite commitment" that "Academy Press intended to publish [the book]"; that the letter "rather than presenting any misrepresentation makes it clear that a November 1976 publication date is not feasible"; and that "the act complained of did not occur in Oregon."

In our view, the interpretation and effect to be given to that letter, including the question whether that letter constituted a "definite commitment" to publish the manuscript, so as to constitute a defense to the allegations of misrepresentation as set forth in the complaint of Mr. Hart, are problems to be decided on trial of this case. It is also our opinion that this letter is not necessarily inconsistent with our holding that the complaint of Mr. Hart and the affidavit submitted by him in opposition to the motion to quash presented sufficient facts to sustain the jurisdiction of the Oregon court over the tort cause of action as alleged in that complaint.

Press. It follows that the alternative writ of mandamus must be dismissed.[10]

**HOLMAN, J.,** concurring.

I concur for the reasons set forth in my concurring opinions in *State ex rel White Lbr. v. Sulmonetti,* 252 Or 121, 128, 448 P2d 571, 574 (1968), and *Wakeman v. Davis,* 271 Or 414, 417, 532 P2d 796, 797 (1975). I would not disagree with an additional test similar to that of *forum non conveniens,* as suggested by Justice Linde in his concurring opinion, in situations in which constitutional but not actual fairness might exist.

**LINDE, J.,** concurring.

I agree that the extended dealings between the parties described in the Court's opinion bring this case within the interpretation given ORS 14.035 in *State ex rel White Lbr. v. Sulmonetti,* 252 Or 121, 448 P2d 571 (1968), and subsequent cases. However, I doubt that the reach of "long-arm" jurisdiction under the statute is adequately defined by saying (1) that the statute means to reach as far as the Federal Constitution permits, and (2) that the Constitution permits whatever is fair. The effect of this approach is to direct the trial court and counsel, whenever a plaintiff has adequately alleged the doing of business or the commission of a tort, to engage in a constitutional dispute about the federal boundaries of state jurisdiction with little guidance from the United States Supreme Court

---

[10]Because we hold that the Oregon court has jurisdiction over the contract cause of action (without reference to the tort cause of action), as well as over the tort cause of action, we need not consider the contention by Academy Press that if this court allows jurisdiction over contract actions "due to allegations concerning the commission of tortious acts, future plaintiffs [will] search long and hard to find a second cause of action in tort to include with their first cause of action in contract, in order to obtain jurisdiction over that first cause of action."

We have not overlooked the recent decision by the Supreme Court of the United States in *Kulko v. California Superior Court,* — US ——, 98 S Ct 1690, 56 L ed 2d 132 (decided May 15, 1978). In our opinion, that decision is not controlling over the decision in this case. We note, however, that the Court in that case has continued to decide such cases by application of the test of what is "fair" and "reasonable."

and by a standard of "fairness" which this court has described as "nebulous." *See Neptune Microfloc, Inc. v. First Florida Utilities, Inc.,* 261 Or 494, 497, 495 P2d 263 (1972).

A nebulous formula like "fairness" serves only to homogenize the question of Oregon's statutory policy, which is our responsibility, and the question of constitutional limitations, in which we are bound by federal standards. As the court points out, these are distinct questions. The case-by-case determinations of this court can in time outline a perimeter for the coverage of ORS 14.035, as stated in *Neptune Microfloc,* 261 Or at 497, but they cannot be conclusive on the limits of "due process" so as to preclude parties from litigating the federal issue in each case.

The federal issue does not, of course, originate with the inclusion of the due process clause in the fourteenth amendment in 1868, 90 years after the formation of the Union. The reach of state jurisdiction and its limits is an issue inherent in any territorial division of legal and political authority, including our federal system. *See Tharalson v. State Dep't of Revenue,* 281 Or 9, 20, 573 P2d 298 (1978); *State ex rel White Lbr. v. Sulmonetti,* 252 Or at 128-133, 448 P2d at 574-577 (O'Connell, J., dissenting). On a territorial view of jurisdiction, the limits of a state's authority to reach persons or property beyond its borders would be conceived in terms of power, not of fairness. "Fairness" is superimposed as a standard only after the development of the doctrine that only a fair procedure could be "due process." It finds expression in the phrase from *International Shoe Co. v. Washington,* 326 US 310 (1945), on which this court's past opinions have relied, that a state's assumption of jurisdiction must not "offend traditional notions of fair play and substantial justice.[1]

---

[1] *See Myers v. Brickwedel,* 259 Or 457, 462-464, 486 P2d 1286 (1971); *State ex rel White Lbr. v. Sulmonetti,* 252 Or 121, 124, 448 P2d 571 (1968);

Perhaps even without a Civil War and a fourteenth amendment, the law of state jurisdiction within a multistate system like ours would have evolved to a search for "contacts" sufficient to justify the "fairness" of jurisdiction in the forum state.[2] But that "fairness" has not wholly displaced the older concepts of federalism appears in another phrase from *Hanson v. Denckla,* 357 US 235, 251 (1958), *quoted in State ex rel Western Seed v. Campbell,* 250 Or 262, 273, 442 P2d 215 (1968), *cert denied,* 393 US 1093 (1969), that due process limitations "are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States."

It is not particularly logical to treat power and fairness as a single issue, amenable to a single test. To the extent that the territorial principle retains independent force, it implies the existence of general criteria focused on the characteristics of states in a federation, not on the circumstances of particular litigants. "Fairness," by contrast, purports to concern the propriety of the forum with respect to the relative positions of the litigants. But when "fairness" is used to describe the conditions under which the forum state

*State ex rel Western Seed v. Campbell,* 250 Or 262, 272, 442 P2d 215 (1968), *cert. denied,* 393 US 1093 (1969); *cf. Enco, Inc. v. F. C. Russell Co.,* 210 Or 324, 335-336, 311 P2d 737 (1957).

The question whether there are or are not fixed limits to state jurisdiction is begged by the ambiguity of the quoted formula from *International Shoe* itself: Does the phrase mean that state jurisdiction must satisfy "fair play and substantial justice," which are "traditional notions" with changing content, or does it mean that state jurisdiction must satisfy the *traditional* notions of what constitutes fair play and substantial justice, even though circumstances change?

[2]By contrast, the need to harmonize different national laws on jurisdiction among members of the European Economic Community led to a convention that bases jurisdiction in civil and commercial matters primarily on the domicile of the defendant, although contract actions may be brought where the contract is to be performed, and there are special rules for insurance and other claims. *See* Bartlett, *Full Faith and Credit Comes to the Common Market: An Analysis of the Provisions of the Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters,* 24 Int'l & Comp L Q 44 (1975).

may constitutionally take jurisdiction of a claim against a defendant outside the state, those conditions will necessarily be stated as factors or patterns that make long-arm jurisdiction "fair" and therefore constitutional as a general rule for all similar cases, irrespective of the relative positions of the litigants in the particular case. There may be far less unfairness in asking a defendant in Vancouver, Washington, with full notice of the proceedings, to litigate a case in Multnomah County, Oregon, than to demand this of a defendant in Fort Lauderdale, Florida, as in *White Lbr.,* but territorial notions of a prior "entry into" or "presence in" the jurisdiction may allow one and not the other. On the other hand, there is no obvious connection between a territorial conception of power and the question whether a defendant's contacts with the forum state were "purposeful," *Hanson v. Denckla, quoted in Western Seed,* 250 Or at 273.

Justice Goodwin writing for the court in *Western Seed* and subsequently Justice Holman in *White Lbr.,* 252 Or at 128 (concurring opinion), and *Wakeman v. Davis,* 271 Or 414, 417, 532 P2d 796 (1975) (concurring opinion), have suggested that when an enterprise chooses to take advantage of a multistate market to sell its products (or for that matter, to obtain resources or capital), it may fairly expect to litigate in the state of the other party to the transaction. Insofar as the general constitutional test of "fairness" is concerned, I think this may well be correct. As I have suggested above, however, fairness to particular litigants is often an ad hoc rather than a categorical determination, and one that cannot be properly decided as a matter of Oregon law so long as we treat it as one that must always be litigated as an issue of federal constitutional law. To permit such ad hoc determinations of fairness requires a nonconstitutional element in ORS 14.035 corresponding to the doctrine of *forum non conveniens. See* Scoles, *Oregon Conflicts: Three Cases,* 49 Or L Rev 273, 278-280 (1970). It should be possible for an Oregon court to dismiss a case after allowing

[ 721 ]

plaintiff time to obtain jurisdiction in a more appropriate forum (perhaps involving a stipulation by defendant as to service of process, waiver of the statute of limitations, or other safeguards for plaintiff) irrespective of whether the Oregon court believes that its own exercise of jurisdiction would be unconstitutional.

In Illinois, the source of our long-arm statute and the doctrine of its expansive scope, *see Western Seed,* 250 Or at 270-271, the state supreme court in fact approves such a dismissal of cases without a conclusion whether the Constitution would permit the state to assert jurisdiction. *See, e.g., Adkins v. Chicago, R. I. & P. R.R.,* 54 Ill 2d 511, 301 NE2d 729 (1973), *cert. denied,* 424 US 943 (1976), *cf. Cotton v. Louisville & N. R.R.,* 14 Ill 2d 144, 152 NE2d 385 (1958).[3] Elsewhere the procedure has been codified.[4] These solutions, and

[3] The Illinois court held that discretion to retain jurisdiction or dismiss under *forum non conveniens* lies initially with the trial court, presumably within the usual limits. It is not clearly established whether Oregon courts have similar discretion, although *Horner v. Pleasant Creek Mining Corp.,* 165 Or 683, 703-704, 107 P2d 989 (1940), *reh. den.* 109 P2d 1044 (1941), seems to hold that they do. Other states also have adopted the same solution by judicial decision. *See, e.g., Cray v. General Motors Corp.,* 389 Mich 382, 395, 207 NW2d 393, 59 ALR 3d 127 (1973); *Silver v. Great American Ins. Co.,* 29 NY2d 356, 360-361, 278 NE2d 619, 328 NYS2d 398 (1972); *Werner v. Werner,* 84 Wash 2d 360, 371, 526 P2d 370 (1974); *Developments in the Law—State-Court Jurisdictions,* 73 Harv L Rev 909, 1008-1009 (1960).

[4] A number of jurisdictions have adopted the Uniform Interstate and International Procedure Act which provides in section 1.05:

When a court finds that in the interest of substantial justice [an] action should be heard in another forum, the court may stay or dismiss the action in whole or in part on any conditions that may be just.

*See, e.g.,* Ark Stat Ann § 27-2502 (Supp 1975); Mass Gen Laws Ann ch 223A, § 5 (Supp 1977-1978). California has enacted a similar provision. *See* Cal Civ Pro Code § 410.30 (1973). The California Supreme Court has described this statute as a codification of the *forum non conveniens* doctrine which had been "established in California by judicial decision." *Archibald v. Cinerama Hotels,* 15 Cal 3d 853, 857, 544 P2d 947, 126 Cal Rptr 811 (1976). Wisconsin has enacted a more detailed *forum non conveniens* statute. It provides:

(1) *Stay on initiative of parties.* If a court in this state, on motion of any party, finds that trial of an action pending before it should as a matter of substantial justice be tried in a forum outside this state, the court may in conformity with sub. (3) enter an order to stay further

the underlying distinction between "fairness" as the presence of constitutional prerequisites and fairness of the choice of forum in the actual case, are described in Morley, *Forum Non Conveniens: Restraining Long-Arm Jurisdiction,* 68 NW U L Rev 24 (1973). Once it is recognized that fairness is properly a matter of Oregon law before it becomes, in a different sense, a synonym for federal constitutional limits, a procedure to assure fairness can be provided by a statute or perhaps a rule of the Council on Judicial Procedure, or possibly by further consideration of the standards implicit in ORS 14.035. However, the last of these possibilities has not been briefed in this case. Accordingly, I concur in the decision.

proceedings on the action in this state. A moving party under this subsection must stipulate consent to suit in the alternative forum and waive right to rely on statutes of limitation which may have run in the alternative forum after commencement of the action in this state. A stay order may be granted although the action could not have been commenced in the alternative forum without consent of the moving party.

. . . .

(3) *Scope of trial court discretion on motion to stay proceedings.* The decision on any timely motion to stay proceedings pursuant to sub. (1) is within the discretion of the court in which the action is pending. In the exercise of that discretion the court may appropriately consider such factors as:

(a) Amenability to personal jurisdiction in this state and in any alternative forum of the parties to the action;

(b) Convenience to the parties and witnesses of trial in this state and in any alternative forum;

(c) Differences in conflict of law rules applicable in this state and in any alternative forum; or

(d) Any other factors having substantial bearing upon the selection of a convenient, reasonable and fair place of trial.

Wis Stat Ann § 801.63 (1977).