HALLIBURTON COMPANY,
Appellant (Plaintiff),

v.

Patti CLAYPOOLE, Appellee
(Defendant).

Patti CLAYPOOLE, Appellant
(Defendant),

v.

HALLIBURTON COMPANY,
Appellee (Plaintiff).

Nos. 93–17, 93–18.

Supreme Court of Wyoming.

Feb. 3, 1994.

Thomas R. Smith, Murane & Bostwick, Casper, WY, for Halliburton Co.

Stephen R. Winship, Donald R. Winship & Associates, P.C., Casper, WY, for Patti Claypoole.

Before THOMAS, CARDINE, and GOLDEN, JJ., Brown, J. (Retired), and McEwan, D.J. (Retired).

McEWAN, District Judge (Retired).

The Halliburton Company appeals from a judgment entered upon a jury's verdict. It contends the district court erred in denying its post-trial motions and that, in essence, the judgment is not supported by sufficient evidence, particularly with regard to the jury's finding that Halliburton defrauded Patti Claypoole. In her cross-appeal, Claypoole asserts the jury's verdict was sound in all respects and that the district court erred in reducing the jury's general damage award, as well as the punitive damage award.

We affirm in part, but reverse the district court insofar as it reduced the general and punitive damage awards.

As appellant in Case No. 93-17, Halliburton raises these issues:

1. Whether the court erred in denying Halliburton's motions for a directed verdict or subsequent motion for judgment notwithstanding the verdict?

2. Whether the trial court erred in denying Halliburton's motions for a new trial either because a) the verdict was contrary to law, b) the verdict was not sustained by sufficient evidence, or c) there was an error of law at trial?

3. Whether a new trial should be granted based upon prejudicial testimony of Claypoole's counsel during *voir dire* of the jury panel?

Claypoole provides this summary of the issues in response:

1. Was there an absence of evidence to support the verdict entered?

2. Whether the denial of a motion for a directed verdict is an appealable order.

3. Was it an abuse of discretion by the trial court in denying the motion for new trial?

4. Whether Appellant properly preserved its objections.

As appellant in Case No. 93-18, Claypoole contends:

1. Whether, in view of W.S. § 38-1-101, the District Court should have directed a verdict for Appellant.

2. Whether the District Court should have instructed the jury concerning the duties of Appellee under W.S. § 38-1-101.

3. Whether the District Court should have instructed the jury concerning the duty of Appellee to exercise good faith, ordinary care and diligence in obtaining and administering Appellant's guaranty.

4. Whether the District Court should have instructed the jury on the enforceability of a contract based on "moral consideration".

5. Whether the District Court erred in reducing the jury's verdict.

Halliburton summarizes its response to those arguments as follows:

1. Whether Wyoming Statute § 38-1-101 required Halliburton to proceed against Denton before filing suit against Claypoole?

2. Whether the District Court erred in not instructing the jury on defendant/counterclaimant's theory of negligence?

3. Whether the District Court was correct in not instructing on defendant/counterclaimant's theory of moral consideration?

4. Whether the District Court properly exercised discretion in reducing the jury's verdict?

5. Whether this court's standard of review, giving to the evidence of the successful party every favorable inference which may reasonably and fairly be drawn from it, gives allowance to unsubstantiated inferences?

The facts of this case are somewhat complicated. Patti Claypoole's father, Deto Lawson, invested in several oil wells with Rance Denton's father, usually as a working interest owner. Denton's father died in 1972, and, thereafter, Lawson continued to invest in wells with Denton. Eventually, Denton sold all of his interest in those developments to Lawson, although Denton continued to help with some of the work. Several years later, Denton formed his own oil companies. By agreement dated August 8, 1988, Lawson and Denton entered into an arrangement as co-venturers to develop an oil well in Adams County, Colorado. In early 1989, Lawson

also put up collateral for several bonds on wells Denton intended to develop. Denton sought to have some work done for him by Halliburton on wells he was developing and, because of his poor credit rating, Halliburton insisted upon having a guarantor for payment of those services.

In their arrangements with Halliburton, Denton and Lawson dealt with Jerry Stroud who was Halliburton's credit manager. Stroud was aware that Denton had been in bankruptcy and that he owed the Internal Revenue Service a considerable amount of money. Moreover, Stroud never expected that Denton would make any payments, indeed, Denton owed Halliburton for services which had never been paid for, going back as far as 1982. Denton also asserted that Lawson understood that he would be paying for the services as the primary debtor, but that the guaranty arrangement would allow them six months of free credit. By "Letter of Guaranty" signed on January 13, 1989, Lawson agreed to pay to Halliburton the indebtedness of Idagas Oil Company (one of Denton's companies) up to a limit of $50,000.00 for work done after January 10, 1989. In a letter dated January 10, 1989, and addressed to Stroud, Lawson stated:

Enclosed is a copy of my financial statement as of December 31, 1988. I have agreed to guarantee for Rance Denton and his company up to $50,000.00 on a note or whatever you and Rance have agreed on. My understanding this work will be done on his wells in Adams County, Colorado. Rance has assured me you would keep my financial statement confidential and only discuss it with him or I. I have an interest in Rance's project that he will be drilling and completing in Adams County, Colorado and think it will be a success. My only requirement would be if agreeable to you, Halliburton will give me sixty (60) days notice in the event Rance and his company should default on this agreement.

By a handwritten "deal" dated and signed on February 23, 1989, Lawson and Denton agreed:

This agreement made this 23rd day of February 1989 by and between Deto Lawson and Rance Denton. Deto Lawson has

made an agreement with Halliburton Services of Denver in which Deto Lawson will pay for services provided by Halliburton in wells that Rance Denton and his company has put together to drill. Rance Denton agrees that all assignment will be made to Deto Lawson or Patti Claypoole for the working interest earn[ed] in each well if the wells are productive.

Rance Denton has several notes with Deto Lawson on interest of past and current wells. Deto Lawson agrees that all notes and mon[e]y had been paid in full by Rance Denton to Deto Lawson.

Rance Denton agrees that Deto Lawson will earn his pro rata share of all cost that Halliburton provide for Deto Lawson share of the AFE or actual costs on each well. This will also pertain to any equipment that Deto Lawson will furnish.

Deto Lawson has provided Rance Denton with Drilling Bonds for his wells in Colorado or wherever else Rance Denton needs for his companies. Rance Denton agrees to assign ½% carried working interest to Deto if any well is productive that Deto Lawson bond is on.

Deto Lawson died on April 5, 1989. Stroud took the view that Lawson's guaranty was no good after his death. When he became aware that Lawson had died, he insisted that Denton immediately supply another guarantor. Stroud also knew that if he wanted to enforce the guaranty against Lawson he would have had to file a claim against Lawson's estate, but he did not do so. Thus, even long after Lawson died, there were a number of outstanding charges not yet paid and no effort was made to collect those.

Denton brought Patti Claypoole to Stroud's office on July 18, 1989, and on that date she signed letters of guaranty essentially identical to that previously signed by her father. The guaranties were on behalf of Idagas and IDG Exploration, Inc., both companies principally owned and run by Denton. Stroud did not expect Idagas or IDG Exploration to pay the sums guaranteed by Patti Claypoole, just as he had not expected Denton to pay on her father's earlier guaranty. Claypoole sent Stroud a letter similar to the letter her father had sent indicating that her

guaranty was for work in Adams County. Claypoole, however, did not indicate that she had any interest in Denton's developments. Stroud basically ignored the contents of that letter, including the portion indicating that Claypoole intended only to guarantee work done on wells in Adams County, Colorado, as he had also done with Lawson's earlier letter. In addition, Stroud did not inform Claypoole that he assigned the limitation in her letter no meaning. Stroud very reluctantly agreed that the guaranty used in this situation was unusual because there was no intent to seek payment from the primary debtor (Denton or his companies). Indeed, by letter and agreement, Claypoole undertook to guaranty payment for all services rendered under her father's guaranty, in part because she felt she was obligated to because she was the executrix of her father's estate. She also guaranteed work done between the time of her father's death and the date of her guaranty. By the time she signed her first guaranty it was over 50% exhausted by commitments made prior to her signing it. Claypoole eventually paid everything owed to Halliburton under her agreement and, in early January, asked to be released from her guaranty.

By letter agreement dated May 3, 1990, Claypoole then entered into a second agreement to guarantee payments for Denton. Although this agreement was not in the same form as the earlier guaranties, it was treated by Halliburton on internal credit documents as a guaranty. As a part of this guaranty, Claypoole undertook to pay for services which had been performed for Denton without there being a guaranty in place. Moreover, the billings which Claypoole received from Stroud did not show well locations, though it was the usual practice of Halliburton to send guarantors invoices which showed well locations. In mid-April 1990, Claypoole received copies of the actual invoices which included well locations. After having had time to study those invoices, but not before she signed the second commitment to underwrite Denton, she realized that she had vastly overpaid for wells that were not located in Adams County. Claypoole

then canceled her second guaranty on July 24, 1990. Claypoole actually contended that she did not even remember that she had signed the second guaranty. The record also demonstrates that Stroud could remember very little about either of Claypoole's guaranties, even when presented with documentation that he himself had prepared. At this point, Claypoole offered to pay Halliburton for work done on a well in Adams County, after offset for sums she had paid which she contended she did not owe, and no more. Halliburton did not accept that settlement offer.

Instead, on January 30, 1993, Halliburton filed suit against Claypoole, premised upon breach of contract, seeking to recover the sum of $30,930.49, plus costs and attorney's fees. Claypoole answered and counterclaimed against Halliburton alleging that she had overpaid Halliburton, that Halliburton had defrauded her and breached the implied covenant of good faith and fair dealing. She also filed a third-party complaint against Denton[1]. The case was tried to a jury and the jury found that Claypoole owed Halliburton $1,792.52; that Halliburton owed Claypoole $36,975.74; that Denton owed Claypoole $56,688.00; that Halliburton committed fraud in its dealings with Claypoole and that Halliburton should pay Claypoole $76,000.00 as punitive damages.

Halliburton made a number of post-trial motions and they were denied, with this exception: The district court found that the jury had duplicated items in its award of damages and, therefore, the award of actual damages had to be reduced by the sum of $11,229.60 and the punitive damages had to be reduced by a parallel sum of $22,000.00. Judgment was entered accordingly and Halliburton appeals from that judgment as outlined above. Claypoole appeals that aspect of the judgment which found the jury duplicated items, thus reducing the total judgment by over $33,000.00.

Halliburton contends that the acts of Stroud were not fraudulent and that Halliburton should be allowed to collect the debts justly owed by Claypoole to Halliburton. As its first contention, Halliburton asserts the

---

1. Claypoole also recovered a judgment against     Denton, but Denton did not appeal.

district court erred in not granting a directed verdict for Halliburton. Halliburton states that all charges sent to Claypoole were for services provided under her guaranties and that no misrepresentations were made to Claypoole by Halliburton or Stroud. Halliburton also contends that Claypoole could have amended her complaint to make her allegations of fraud more specific, but she did not do so. Thus, according to Halliburton she is stuck with the pleadings as they appear in the record and, based upon those pleadings, she failed to prove fraud as she alleged it.

In reviewing this contention of error, we accept the plaintiff's evidence as true and afford it every favorable inference which may reasonably and fairly be drawn from the evidence. *Crown Cork & Seal Co. v. Admiral Beverage Corp.*, 638 P.2d 1272, 1274–75 (Wyo.1982). Of course, no rule can be applied without a certain degree of prudence and, under the circumstances presented here, it is difficult to refrain from noting that Stroud's testimony lacked virtually all of the features customarily associated with verity. We seek to determine "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Barnes v. Fernandez*, 526 P.2d 983, 985 (Wyo.1974); *and see Kaiser v. Farnsworth Drilling Co., Inc.*, 851 P.2d 1292, 1295 (Wyo.1993); and *Cody v. Atkins*, 658 P.2d 59 (Wyo.1983). We must apply that standard of review in combination with our standard of review for assessing claims of fraud:

The elements of a claim for relief for fraud are a false representation made by the defendant which is relied upon by the plaintiff to his damage, the asserted false representation must be made to induce action, and the plaintiff must reasonably believe the representation to be true. A plaintiff who alleges fraud must do so clearly and distinctly, and fraud will not be imputed to any party when the facts and circumstances out of which it is alleged to

arise are consistent with honesty and purity of intention. Fraud must be established by clear, unequivocal and convincing evidence, and will never be presumed.

*Lavoie v. Safecare Health Service, Inc.*, 840 P.2d 239, 252 (Wyo.1992) (quoting *Duffy v. Brown*, 708 P.2d 433, 437 (Wyo.1985)).

■ We need not exhaustively enumerate the possibilities which a jury might have considered under these rather involved facts. We are satisfied that a fact finder could have inferred, from all the circumstances presented, that Halliburton represented to Claypoole that she was to serve as a guarantor for Denton only for the duration of her guaranties and only for wells in Adams County. The fact finder might also have readily inferred that those representations were false in that Halliburton never intended for Claypoole to be a guarantor and never really treated her as one. *See generally*, 38 Am. Jur.2d *Guaranty*, §§ 1, 12–18 (1968). The jury apparently decided that what Claypoole signed were letters of guaranty, but that they were limited in duration and scope. One of Halliburton's principal claims is that the jury could not construe the guaranties except as set out in the "four corners" of the guaranty. Under the circumstances presented here, we can only determine that the jury properly viewed the entire course of dealings at issue and that the "contract" between Halliburton and Claypoole had to be viewed in the light of more than just the letters of guaranty. *See Peters Grazing Ass'n v. Legerski*, 544 P.2d 449, 459 (Wyo.1975); *Town of Lovell v. Menhall*, 386 P.2d 109, 112–16 (Wyo.1963); *Laibly v. Halseth*, 345 P.2d 796, 800 (Wyo.1959). Halliburton contends that Claypoole's letter of August 10, 1989, was a unilateral modification of the guaranty which the specific terms of the guaranty prohibited. However, Stroud and Halliburton demonstrated through the course of dealings that the "contract"[2] was freely modifiable when circumstances required. There is no question that Claypoole relied on Halliburton's representations, believed them to be true and was damaged as a result. In answer to Halliburton's assertion that Claypoole did not

---

**2.** Whether it was a guaranty, or some other sort of agreement is not especially important. Indeed, it might be impossible to definitively characterize it.

prove fraud exactly as she alleged it in her complaint, we note that when an issue not raised by the pleadings is tried by express or implicit consent of the parties, it will be treated in all respects as if it had been raised in the pleadings. WYO.R.CIV.P. 15(b); *Title Guaranty Co. of Wyo. v. Midland Mortg. Co.*, 451 P.2d 798, 800 (Wyo.1969); 6A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: *Civil* 2d § 1493, p. 50 (1990). Under these circumstances, the district court properly denied Halliburton's motion for a directed verdict, as well as the motion for judgment notwithstanding the verdict. *Potts v. Brown*, 452 P.2d 975, 979 (Wyo.1969).

Halliburton next contends that the district court erred in denying its motion for new trial. WYO.R.CIV.P. 59(a)(6) provides that a new trial may be granted on grounds: "That the verdict, report or decision is not sustained by sufficient evidence or is contrary to law." To this end, Halliburton postulates an "explanation" for how the jury improperly reached its verdict. To repeat it here would only add another level of confusion to this matter. We have already noted above that we are comfortable that there was sufficient evidence for the jury to deliberate Claypoole's allegation of fraud. We are unable to discern facts or circumstance which would lead us to conclude that the evidence was not sufficient to sustain the verdict or that the verdict is contrary to law. All relevant facts were presented to the jury, albeit it in a manner which almost defies precise description. The jury was instructed in a manner consistent with the parties' positions and, for the most part, without meaningful objection. *See City of Cheyenne v. Simpson*, 787 P.2d 580, 582 (Wyo.1990); *Gary v. Foster Lumber Co., Inc.*, 531 P.2d 497, 498 (Wyo.1975). We are unable to conclude that the district court abused its discretion in denying the motion for new trial. WYO.R.CIV.P. 59(a)(6); *Carlson v. Carlson*, 836 P.2d 297, 304–05 (Wyo. 1992); *Vivion v. Brittain*, 510 P.2d 21, 25–26 (Wyo.1973).

■ Finally, Halliburton contends the motion for new trial should have been granted because counsel for Claypoole made improper comments to the jury during voir dire. Because voir dire was not reported, the record contains a settled statement of what occurred, in accordance with WYO. R.APP.P. 3.04. Claypoole's lawyer stated that Claypoole was an unsophisticated waitress who was dealing with skilled and sophisticated businessmen. Counsel for Halliburton objected and, at a side-bar discussion, out of hearing of the jury, the district court directed that no further comments be made in that regard and that the statement bordered on grounds for a mistrial. Halliburton did not seek grant of a mistrial, but now contends that it is grounds for a new trial. Halliburton fails to present either cogent argument or pertinent authority in this regard and we will not consider that issue further. WYO.R.APP.P. 7.01(f); *Amrein v. Wyoming Livestock Bd.*, 851 P.2d 769, 772 (Wyo.1993). Nonetheless, we consider it instructive to admonish counsel that, while a wide latitude should be afforded counsel in examining jurors, that concept is not without limits. If a question of the nature as that at issue here may be relevant, the trial court should be informed before the question is asked to avoid the possibility of creating an unfair attitude toward any litigant and the prospect of a mistrial. *Morrow v. Zigaitis*, 608 S.W.2d 427 (Mo.App.1980); 47 AMJUR.2d *Jury*, § 427 (1969).

■ At oral argument, Claypoole conceded she did not really seek reversal of the judgment and a new trial, and that the issues raised in her cross-appeal were "defensive" vis-a-vis Halliburton's appeal. In view of our decision to reinstate the verdict, we need not address the issues she raised further. Halliburton contends the jury used duplicative figures in reaching its general verdict against Halliburton. Halliburton's argument has some level of believability, however, the record simply does not adequately bear out its contention. The record discloses that a pretrial was held in this case and, customarily, one of the functions of pretrial is to ascertain the exhibits which will be offered at trial. If this was in fact done, it was not included in the record. If it had been done, Halliburton could easily have determined that the exhibits to be offered by Claypoole were faulty for the reason that they were duplicative of some

elements of damage. Closing arguments in the first phase of the trial were not reported and, thus, we are unaware of exactly what argument was associated with the disputed Exhibit XX which Halliburton claimed introduced the error to the jury. The so-called Exhibit XX was not really an exhibit, but a chart drawn by Claypoole's counsel in closing argument. Halliburton thought it was important to include it in the record and was able to do so by post trial motion. We agree that it was important, but for a reason different from that suggested by Halliburton. The chart was only a summary of information evidenced by the invoices which were exhibits and which were used by the jury during its deliberations. Exhibit XX was not taken into the jury room and, since there is no evidence the jury was permitted to take notes, we must assume they arrived at their damage award from the invoices which were in evidence. The duplication of invoices was readily apparent and could easily have been noted in the process of jury deliberation. At closing argument, Halliburton knew, or should have known, of the duplicate entries. At that juncture Halliburton could or should have taken steps to have the jury properly instructed on the duplications, but it took no such action. The record does include both the argument associated with the punitive damage phase of the trial, which was, of course, presented to the same jury immediately following the general liability/damage phase of this case. During those proceedings, and while the jury was still available to answer the very question which Halliburton contends this court should answer, Halliburton advanced its theory that the jury had duplicated some of the damages, but made no meaningful effort to reconsider its damage award. The inconsistent and muddled "numbers" presented to the jury afforded it some measure of territory from which it could model a verdict.

We have examined the "numbers" as conscientiously as is possible given the state of the record. Our undertaking here is to assess whether the district court abused its discretion in altering the verdict reached by the jury. At worst, we recognize that the jury did not select a "number" which pops out of the record easily recognized. On the other hand, the jury's final "number" is consistent with the overall evidence. Absent an objection raised in a manner timely enough so that the apparent inconsistency could be called to the attention of the jury, we are unable to conclude that the jury failed in its responsibility to faithfully calculate a damage award. We are most reluctant to disturb the verdict of a properly instructed jury. Here there were no meaningful objections to the instructions, and so we must assume the parties were satisfied with them. The proper time to challenge the verdict was when the jury was still able to explain that which Halliburton now considers to be an inconsistency. *Caterpillar Tractor Co. v. Donahue,* 674 P.2d 1276, 1284 (Wyo.1983). Failure to raise this matter before the jury was released, as provided for in WYO.STAT. § 1–11–213 (1988), results in waiver of the right to complain about inconsistencies or irregularities in the verdict. Moreover, because of the opportunity to correct the verdict offered by § 1–11–213, the complaining party will be held to have waived the error notwithstanding its degree of irregularity or impropriety. In the case at bar, no matter how obvious the irregularity, the right to complain of the verdict was waived. *Goggins v. Harwood,* 704 P.2d 1282, 1289–1292, 1296 (Wyo.1985); *DeWitty v. Decker,* 383 P.2d 734, 738–740 (Wyo.1963). Thus, we conclude that the district court abused its discretion in reducing the jury's award of general damages against Halliburton. *See Big–O Tires, Inc. v. Santini,* 838 P.2d 1169, 1175 (Wyo.1992). Consistent with this holding, we need not further consider the jury's award of punitive damages.

Therefore, we hold that under the circumstances of this case, the jury's verdict, as rendered, must be reinstated. Accordingly, we remand to the district court with directions that judgment be entered consonant with the jury's verdict, i.e., the judgment against Halliburton, and in favor of Claypoole, should be: $36,975.74 in general damages plus $76,000.00 in punitive damages, less an offset in favor of Halliburton of $1,792.52; a net judgment for Claypoole of

$111,183.22. As thus modified, the judgment of the district court is affirmed.