Argued May 10, demurrer sustained; writ dismissed
December 18, 1968

# STATE ex rel WHITE LUMBER SALES, INC., *Plaintiff, v.* SULMONETTI, *Defendant.*

448 P. 2d 571

*William B. Crow*, Portland, argued the cause for plaintiff. On the brief were Fredric A. Yerke, Jr., Jean P. Lowman, and King, Miller, Anderson, Nash & Yerke, Portland.

*Denton G. Burdick, Jr.*, Portland, argued the cause for defendant. On the briefs were Hutchinson, Schwab & Burdick, Portland.

Before McAllister, Presiding Justice, and Sloan, O'Connell, Goodwin, Denecke, Holman and Rodman, Justices.

GOODWIN, J.

White Lumber Sales, Inc., a Florida corporation, brings an original proceeding in mandamus to compel the trial court to quash the return of service made pursuant to ORS 14.035(1)(a)[1] in an action by an

---

[1] ORS 14.035 "(1) Any person, firm or corporation whether or not a citizen or a resident of this state, who, in person or through an agent, does any of the actions enumerated in this subsection, thereby submits such person and, if an individual, his personal representative to the jurisdiction of the courts of this state, as to any cause of action or suit or proceeding arising from any of the following:

"(a) The transaction of any business within this state * * *."

unpaid seller of plywood. Briefs and argument were addressed to the demurrer to an alternative writ heretofore issued by this court.

The sole question is whether the relator, herein referred to as White, constitutionally can be said to have transacted business within this state so as to bring itself within the long-arm jurisdiction of our courts in the action pending below.

The facts of the case at bar, insofar as they are material to the jurisdictional question, are as follows: Continental Forest Products, Inc., an Oregon corporation engaging in the wholesale lumber and plywood business, has its offices and principal place of business in Lake Oswego, Oregon. White is a lumber and plywood wholesaler with offices and principal place of business in Fort Lauderdale, Florida. White had purchased plywood from Continental in the past, and by telephone requested a quotation on an order of twenty cars of plywood to be manufactured to specifications furnished by White. After consulting its suppliers, Continental quoted White prices and terms for delivery to a site in Gainesville, Georgia. Continental thereafter received a telephoned purchase order from White and instructed a mill in Grants Pass to begin work toward filling the order. In due course of mail, the telephoned order was confirmed in writing. The first three cars of plywood were shipped pursuant to the purchase orders.

After receiving and paying for one car of plywood, White notified Continental of a complaint with reference to the conformity of the plywood to the order. A dispute between buyer and seller over the suitability of the plywood eventually resulted in an action being filed for the purchase price together with damages for the losses incurred in manufacturing plywood

not shipped, and further damages for the alleged breach of the contract to buy the remainder of the twenty carloads.

Commendable advocacy on both sides has been expended in an attempt to define the place where and the time when title passed, who paid the freight, who had the risk of loss, and which end of the transcontinental telephone conversation marked the point where the contract was made. While these and similar inquiries may be relevant in solving certain problems in the substantive law of sales, we do not believe such definitions to be determinative of the question involved in this case.

Here, the state's jurisdiction to try a case has been challenged on grounds of fairness and justice. The meaningful inquiry, therefore, is whether a foreign purchaser has produced effects in the forum state of such significance that it is not manifestly unfair to require him to resolve a resulting legal dispute in this state.

We have already settled the question of legislative intent. In *State ex rel Western Seed v. Campbell,* 250 Or 262, 442 P2d 215 (1968), we held that the Legislative Assembly intended the long-arm statute to reach to the outer limits of federal constitutional due process.

■ When jurisdiction over an out-of-state defendant is challenged, the due-process question is whether the alleged facts are such that the forum may exercise jurisdiction without offending traditional notions of fair play and substantial justice. *Internat. Shoe Co. v. Washington,* 326 US 310, 316, 66 S Ct 154, 90 L Ed 95 (1945). If we can answer that question in favor of jurisdiction, there is no constitutional impediment to holding that the alleged facts constitute, within

the meaning of ORS 14.035(1)(a), the transaction of business within this state.

■ The pending litigation clearly lies in the wake of the order which White placed with Continental. Whether or not "title passed," the telephone order produced substantial business consequences in Oregon. Written confirmation merely reinforced the order. Physical presence within the forum state is not necessary to the existence of a tort within the state. *State ex rel Western Seed v. Campbell,* supra; *Pegler v. Sullivan,* 6 Ariz App 338, 432 P2d 593 (1967). On the score of physical presence there is no substantial reason for distinguishing business transactions from personal injuries. *Koplin v. Thomas, Haab and Botts,* 73 Ill App 2d 242, 253-255, 219 NE2d 646, 651-652 (1966).

The difficulty in applying subjective standards like fair play and substantial justice has not kept courts from attacking the due-process problem. The pattern that seems to be developing allows statutes similar to ORS 14.035 to confer jurisdiction. See *Buckley v. New York Post Corporation,* 373 F2d 175 (2d Cir 1967). While the *Buckley* case involved tort (libel) rather than contract, and the long-arm statute of Connecticut differs in some respects from our own, Judge Friendly's analysis of the due-process issue seems persuasive:

"* * * Once we free our minds from traditional thinking that the plaintiff must inevitably seek out the defendant, such a doctrine would not seem to violate basic notions of fair play; any view that it does must rest on an inarticulate premise, which a legislature is free to question, that plaintiffs are much more given to making unjust claims than defendants are to not paying just ones. Indeed, when the operative facts have occurred

where the plaintiff sues, the convenience of both parties would often be served by a trial there, and the chief benefit to the defendant of a rule requiring the plaintiff to seek him out is the impediment this creates to the bringing of any suit at all * * * [citation omitted]. Unfairness inconsistent with notions of fair play occurs only when a defendant is 'compelled to defend himself in a court of a State with which he has no relevant connection.' D. Currie, * * * [*The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois*, 1963 U Ill L F 533] at 534 * * *." 373 F2d at 181.

To like effect, this court held, prior to the enactment of the long-arm statute, that where a nonresident corporation without office or permanent agents in the state nonetheless had sufficient contacts within the state that it should, in fairness, respond to the summons of our courts, due process was not offended when we required it to respond. *Enco, Inc. v. F. C. Russell Co.*, 210 Or 324, 311 P2d 737 (1957).

In the case at bar, both parties are lumber merchants engaged in interstate commerce. Both parties used conventional and well-understood methods of communicating offers and acceptances. On the strength of a telephoned offer and acceptance, mills in Oregon were told to fabricate a special order of plywood, railroad cars were ordered, crews were assembled in Oregon to load the cars and in Georgia to unload them.

It is clear that the placing of the telephoned order had effects, or "significant contacts," in Oregon. In *McGee v. International Life Ins. Co.*, 355 US 220, 78 S Ct 199, 2 L Ed 2d 223 (1957), *in personam* jurisdiction did not offend due process when a California beneficiary sued in his own state to enforce a mail-order contract made by a Texas insurance company.

In *Hanson v. Denckla,* 357 US 235, 78 S Ct 1228, 2 L Ed 2d 1283 (1958), however, it was held that the interest of the local plaintiff would be insufficient to justify a state in asserting jurisdiction beyond its borders. The court held that the defendant must purposefully avail himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws.

■ From the *McGee* and *Hanson* cases, three criteria can be said to define the present outer limits of *in personam* jurisdiction based on a single act: First, the defendant must purposefully avail himself of the privilege of acting in the forum state or of causing important consequences in that state. Second, the cause of action must arise from the consequences in the forum state of the defendant's activities. Finally, the activities of the defendant or the consequences of those activities must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *Southern Machine Co. v. Mohasco,* 401 F2d 374 (6th Cir 1968).

■ Obviously, the convenience of both parties could not be equally served by giving each a wholly free choice of the forum in which to conduct litigation of the type involved here. On the other hand, a defendant has no greater claim to preferred treatment than has a plaintiff. So long as the defendant is not compelled to defend himself in a distant state with which he has had no relevant connection, he cannot be said to have been denied either fair treatment or substantial justice. We are entitled to assume that buyers are as likely to receive justice in the courts of the states in which they choose to do business as in the courts of the states in which they choose to maintain their principal offices.

Accordingly, the demurrer to the alternative writ is sustained and the writ is dismissed.

HOLMAN, J., concurring.

One who regularly engages in interstate business subjects himself to the possible inconvenience of litigating in other states concerning the business there transacted. Anyone who either buys or sells nationally transacts business in the state of both the buyer and the seller. The fairness involved is really determined by the convenience of the litigants. If it is convenient to transact business it is not so inconvenient to litigate as to be unfair. I disagree that there is any logical basis for giving a preference to a defendant as does the dissenting opinion. Therefore, I concur in allowing the seller to bring an action in Oregon as I would have permitted the purchaser to litigate in its state had it first commenced litigation there against the seller and if the statute in that state was as broad as the one in Oregon.

DENECKE, J., joins in this concurring opinion.

O'CONNELL, J., dissenting.

The rationale of the majority opinion seems to be that placing the telephone order "had effects or 'significant contacts' in Oregon" sufficient to make reasonable the exercise of jurisdiction. I assume that these contacts are those described by the court when it states that "[o]n the strength of a telephoned offer and acceptance, mills in Oregon were told to fabricate a special order of plywood, railroad cars were ordered, crews were assembled in Oregon to load the cars * * *." Such activities are, of course, required by any manufacturer who ships goods to his buyer. Thus, applying this test would yield the necessary "contact" and the power to assert jurisdiction whenever an out-

of-state defendant purchased manufactured goods from an Oregon seller. There is also a reference in the opinion to the interstate character of the business of both plaintiff and defendant, although it is not clear whether this was deemed a significant factor in allocating jurisdiction to Oregon.

The majority opinion is vague in a more important respect. We are told clearly enough that defendant made "contact" with Oregon; we are not told, however, why it is "reasonable" or "fair" under the due process clause of the Fourteenth Amendment to subject defendant to the jurisdiction of our courts. The majority's failure to explain how defendant's contact with Oregon satisfies the due process test for jurisdiction is understandable. In spite of the United States Supreme Court's continued adherence to the due process formula in deciding questions of the limitation on the jurisdiction of state courts, it should be apparent by now that the formula is inappropriate for the solution of the problem and should no longer be employed.

The problem should not be stated in terms of whether it is "fair play" to require defendant to defend in plaintiff's forum; the problem is one of properly allocating the jurisdiction of the state courts which, if not subjected to common controls, could entertain claims inimical to the other states and their domiciliaries. Chief Justice Warren recognized that there are fundamental reasons in addition to fairness to the parties which dictate limitations on the jurisdictional reach of sister states when he said:

> "* * * Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. *They are a consequence of territorial limitations on the power of the respective states.* However minimal the burden of defend-

ing in a foreign tribunal, a defendant may not be
called upon to do so unless he has had the 'minimal
contacts' with that State that are a prerequisite to
its exercise of power over him." *Hanson v. Denckla,*
357 US 235, 251, 78 S Ct 1228, 2 L ed2d 1283, 1296
(1958). (Emphasis added.)

One form of jurisdictional allocation is found in the
full faith and credit clause; each state is required to
recognize the judgments of its sister states. But recog-
nition is required only if the sister state had jurisdic-
tion in rendering the judgment. Thus a state called
upon to adjudicate a claim involving a non-domiciliary
cannot act as a sovereign state (as it would if it were
in an international community of states), but must put
those limits on its sovereignty which are necessary
to coordinate its assertion of power with those of its
sister states. Stated in another way, a state must
test its jurisdiction in each case by putting itself in
the position of a sister state called upon to enforce
a judgment sought by the plaintiff. The interests in-
volved are bilateral: on one hand are the interests of
plaintiff and his state, and on the other the interests
of defendant and his state. Each state may wish to
maximize its own interest but the constitutional com-
pact into which the states entered requires each to ex-
ercise restraint in respect for the other's interests.[①]

---

[①] It has been said of the Full Faith and Credit Clause of our
federal constitution:

"Yet as an instrument of interstate co-operation and fed-
eral harmony among the states, this little-known clause is
of great significance. It permits quasi-sovereign states to re-
tain their local independence without so far ignoring the
legitimate interests of other states as to develop reciprocal
friction, which would ultimately tear the union apart. It thus
restricts a state in preferring its own interests to the point
where no other state can cooperate with it in a mutually satis-
factory union." Avins and Rosenberg, The Full Faith and
Credit Clause in the United States Constitution: An Instru-
ment of Federation, 6 Washburn L J 96-97 (1966).

How that conflict can be resolved will be examined more fully below. It is enough to note at this point that the doctrine of due process and an inquiry into what is "fair play" does not advance us toward a solution. The necessity of adjusting these conflicting interests between the states existed in the United States long before the adoption of the due process clause of the Fourteenth Amendment in 1868. And although due process notions in another form may have been used in resolving problems of jurisdiction prior to 1868,[*] the more common rationale employed in deciding jurisdictional questions is a rather vaguely defined principle that sovereign states in passing upon the question of the scope of their jurisdiction must consider the sovereignty of other states.

Professor Philip Kurland has explained the evolution of our law respecting jurisdiction as follows:

"The real difficulty underlying these [earlier] attempts to work out a rationale for personal jurisdiction lay in the fact that the doctrines were borrowed from laws relating to wholly independent sovereignties which were not relevant to jurisdictions joined in a federation. The basic premise for such decisions was 'that a judgment . . . is necessarily something to be enforced and that a state which is physically impotent to enforce its judgments should be treated as legally incompetent to adjudicate . . .'. But with the Full Faith and Credit Clause as an overriding principle, such a premise only puts the question; it does not answer it. The real question becomes not whether a state could itself enforce a judgment, but rather under what circumstances the national power should be used to assist the extraterritorial enforcement of a state's judicial decrees." Kurland, The Supreme

[*] See Hazard, A General Theory of State-Court Jurisdiction, 1965 Sup Ct Rev 241, 270, n. 102.

Court, The Due Process Clause and The In Personam Jurisdiction of State Courts, 25 U Chi L Rev 569, 585 (1958).

Max Rheinstein sees the problem of adjusting the jurisdictional reach of the states in our union as analogous to that which is involved in adjusting the claims of sovereignty in the international community. Thus he states the principle to be:

"* * * If one state oversteps the limits of its sovereignty, it necessarily infringes upon that of another, and thus violates the Law of Nations by which respect is demanded of each state for the sovereignty of every other." Rheinstein, The Constitutional Bases of Jurisdiction, 22 U Chi L Rev 775, 795-96 (1955).

He then goes on to say:

"* * * We thus reach the conclusion that, insofar as jurisdictional limitations are not based upon notions of fairness and due process, they are founded upon certain principles of the Law of Nations. By virtue of the Law of Nations, the territorial jurisdiction of each state is limited and these limitations of the Law of Nations must be regarded as being implied in the full faith and credit clause of the Constitution of the United States." *Id.* at 796.

It is not suggested that we are presently bound by the jurisdictional rules existing prior to 1868 and it is conceded that "we would, indeed, be hard put even to state what in detail these rules were." But the point that Rheinstein wishes to make is that in the main the limits of jurisdiction are to be set not by the application of the principle of due process but by other principles relating to the need for reciprocal restraints on sovereignty in order to effect a harmony

in the administration of justice among the several states.⑨

I believe the approaches suggested by Rheinstein and Kurland are sound. Even without them, I am firmly convinced that the determination of the scope of a state's jurisdiction is not to be found by an application of the principle of due process.⑩ I agree with Philip Kurland that "[t]he language of 'reasonable-

---

⑨ This idea is more fully developed in the following excerpt from Rheinstein's article:

"* * * What is significant is simply that at the time of the making of the Constitution of the United States the idea obtained that there existed a *ius gentium* in the sense of a legal order common to all Christendom and that this order imposed on all member nations the duty so to confine their legislative, judicial and other activities that all nations could live together in an orderly community. This notion was, as we have seen, regarded as constituting a part of the Constitution of the United States so that the member states could live together in an orderly union. This notion has been made a part and parcel of the full faith and credit clause, which would be meaningless without it. It is in the full faith and credit clause that the Supreme Court is to find the constitutional directive and authorization in detail to determine the spatial confines by which the powers of the several states are delimited against each other. It is also by the incorporation of the idea of the existence of a *ius gentium* in the full faith and credit clause that the Court must implement it so that the several states can harmoniously live and operate together in the framework of the national union." Rheinstein, supra at 816.

⑩ It may be added that if due process is the applicable principle our solution in the present case would not run along the lines developed in the majority opinion but rather we would inquire whether there was a rational basis for the legislation extending jurisdiction of the Oregon courts to the maximum. See Cardozo, The Reach of the Legislature and the Grasp of Jurisdiction, 43 Cornell L Q 210, 211 (1957):

"Should those who enter into the spirit of the modern judicial self-restraint in the field of social and economic regulation also hold that 'the legislature is entitled to its judgment' on the extent of the jurisdictional grasp of the court? If so, due process would allow a party, given some semblance of contact with the state, to be summoned before the courts of that state under any circumstance that the legislature deems fair."

ness' and 'fair play' to which the Court has resorted is rather a statement of a conclusion than a reason."[9] The majority opinion in the present case illustrates the same decisional process. The court makes a few observations concerning "contacts" and, without explaining how these contacts are relevant to "fairness" to anyone, concludes that Oregon has jurisdiction.

Courts which purport to employ the so-called "interest analysis" do no better. Generally this amounts to little more than an identification of one or more ways in which the state asserting jurisdiction is affected by the transaction being litigated. Frequently in that process the side of the scale representing the interest of the defendant or the interest of any other state is given little or no attention.

It is possible that the tendency which the courts have shown to fall into a balancing-of-interest approach in deciding jurisdiction questions represents a judicial groping for the balancing of interests of the sovereign states which must be worked out under the Constitution.

I would treat the problem as one requiring the formulation of criteria based on considerations affecting the respective interests of the plaintiff and defendant and the respective interests of the states of which they are domiciliaries.[10] Some of these considerations have been identified in the cases and articles on jurisdiction and venue. They include litigational considerations associated with the doctrine of forum non

[9] Kurland, The Supreme Court, The Due Process Clause and The In Personam Jurisdiction of State Courts, 25 U Chi L Rev 569, 623 (1958).

[10] Cf., Gulf Oil Corp. v. Gilbert, 330 US 501, 508, 67 S Ct 839, 91 L Ed 1055 (1947) recognizing these two sets of interests in applying the doctrine of forum non conveniens.

conveniens such as "the relative ease of access to sources of proof, the availability of compulsory process for attendance of unwilling witnesses, the cost of obtaining attendance of witnesses, the possibility of a view of the premises if appropriate, and the enforceability of any judgment which is obtained."[7] Consideration also should be given to "intrinsic guarantees against an aberrational or unfair choice-of-law process."[8] The fact that a party is engaged in a commercial enterprise of an interstate nature or, on the other hand, the fact that a party's authority is localized should be taken into account in choosing the appropriate forum. Other factors have been deemed relevant.[9] But factors such as these relate principally to the ad hoc adjustment of the place of trial; our need is for a rule which for reasons other than those affecting the particular case establishes the forum in one state subject, of course, to transfer if advisable.

The rules of venue in this and other states take this basic pattern; plaintiff must normally seek out the defendant in the county in which he resides.[10] This, of course, was the rule at common law. It was also the rule in the Roman law.[11]

The rule establishing venue in the county or dis-

---

[7] Developments in the Law—State-Court Jurisdiction, 73 Harv L Rev 911 at 1010 (1960).

[8] von Mehren and Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv L Rev 1121 at 1174 (1966).

[9] These factors include the relative ability of the parties to litigate in a foreign forum, whether defendant is a buyer or seller, and the expectation of the parties as to the place of suit.

The fact the forum is the only jurisdiction where the interest of all parties may be resolved in a single action is a particularly persuasive reason for entertaining jurisdiction. See Atkinson v. Superior Court, 49 Cal2d 338, 316 P2d 960 (1957), appeal dismissed 357 US 569 (1958), noted 46 Calif L Rev 637 (1958).

[10] See ORS 14.080.

[11] See von Mehren and Trautman, supra note 8 at 1127, n. 13.

trict where defendant resides is explained by some as an anachronism. But this, it appears, is a superficial view. The various suggestions for improving the rules for establishing the place of trial almost always incorporate the idea that defendant's rather than plaintiff's residence should be chosen in the absence of special considerations. Thus in a very careful study on venue in the federal courts Edward Barrett, Jr., after suggesting a reform, expresses the view that:

> "Even with the addition of such a new ground of venue, it would seem that venue based on residence of the defendant should be retained as an alternative. Convenience to the defendant is an important consideration in determining the proper district for trial, and his residence may frequently be the most convenient district."[18]

He adds that:

> "Venue based on residence of the plaintiff has little or no relationship to convenience for trial and should be eliminated entirely."[19]

The proposed change in the federal venue statutes suggested in the American Law Institute's Study of the Division of Jurisdiction Between State and Federal Courts, Tentative Draft No. 6, p. 125 (1968) makes defendant's residence one of the three places of trial available to plaintiff.[20] In a recent and very careful

---

[18] Barrett, Venue and Service of Process in the Federal Courts—Suggestions for Reform, 7 Vand L Rev 608 at 628 (1954).

[19] *Ibid.* at 629.

[20] The comment on Section 1314 of the study reads:

"This subsection gives plaintiff a choice of forum. He may sue: (1) in a district where a substantial part of the events or omissions giving rise to the claim occurred, or where a substantial part of property which is the subject of the action is situated, or (2) where any defendant resides, if all defendants reside in the same state, or (3) where any defendant may be found, if there is no district within the United States which would be a proper forum under (1) or (2)."

study of jurisdiction to adjudicate, von Mehren and Trautman, concluded:

"* * * It is, of course, appropriate to preserve some place where the defendant can be sued on any cause of action. But we submit that only the common arena of the defendant's activities should be such a place. For an individual, the sole community where it is fair to require him to litigate any cause of action is his habitual residence; for a corporation, it is the corporate headquarters —presumably both the place of incorporation and the principal place of business, where these differ." von Mehren and Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv L Rev 1121, 1179 (1966).

The preference for defendant's domicile as the place of trial has not been carefully explained. As noted above, "convenience" is regarded as an important factor. Professor Sunderland suggests that "[i]n general our laws have somewhat favored defendants as against plaintiffs, on the theory, probably, that since the plaintiff controls the institution of suit he might behave oppressively toward the defendant unless restricted."[9] I am not aware of any empirical data that would support the suggested hypothesis and one may question, as Judge Friendly does in the quotation adopted in the majority opinion, the assertion that "plaintiffs are much more given to making unjust claims than defendants are to not paying just ones."[10]

I believe that the preference for defendant's domicile in setting the initial place of trial can be rested upon firmer grounds than those suggested. The preference can be justified on the simple ground that it

---

[9] Sunderland, The Provisions Relating to Trial Practice in The New Illinois Civil Practice Act, 1 U Chi L Rev 188, 192 (1933).

[10] Majority opinion, pages 125, 126 *supra.*

is conducive to the most efficient method of administering justice in those situations where conflicting assertions of jurisdiction might be made. If plaintiff is permitted to choose his domicile as the place of trial as a matter of course, a number of complications may arise. A default judgment rendered in plaintiff's forum would not necessarily prevent defendant from obtaining a conflicting judgment in his own forum.[7] Out of such a circumstance complex legal problems may be generated. Problems as complex may arise where the two actions have not ripened into judgment and efforts to abate are made.[8] Add to this the various maneuvers that can be made by both parties to invoke the jurisdiction of the federal courts and the maze becomes more intricate. A glance at von Mehren and Trautman, The Law of Multistate Problems (1965) will demonstrate the chaos which can flow from jurisdictional conflict.[9]

The allocation of jurisdiction to defendant's domicile can be justified on still another ground. If plaintiff were permitted to obtain a valid judgment in his own forum and the judgment was not satisfied, he

[7] Defendant could, of course, obtain such a judgment by default. But even if plaintiff should appear and defend, the collateral effectiveness of the default judgment is a subject of controversy. Louisell & Hazard, Cases on Pleading and Procedure 573 (1962).

[8] Besides the delays caused by counsel maneuvering for position, the courts of a state may be enticed into issuing injunctions against the continuance of the action in a sister state. See Pound, The Progress of the Law—Equity, 33 Harv L Rev 420, 426-27 (1920). James v. Grand Trunk Western Railroad Co., 14 Ill2d 356, 152 NE2d 858, 74 ALR2d 814 (1958), cert. denied 358 US 915, is a case in which the court was forced to acknowledge the futility of such activity.

[9] Notice that these conflicts are not nearly so likely to arise in a system which places jurisdiction at the defendant's domicile in the absence of some special showing that jurisdiction should be allowed elsewhere.

would ordinarily find it necessary to enforce the judgment by a proceeding brought in defendant's domicile. Conceding that an action to enforce a judgment is normally less complicated than an action to recover an initial judgment, nevertheless it seems reasonable to require the plaintiff to seek his relief in one proceeding. It not only makes for a more economical use of judicial machinery but it may avoid difficult legal questions as to the duty or power of the court to carry out the mandate of the sister-state judgment.

Finally, not the least of the reasons which can be advanced for the choice of defendant's domicile as the place of trial is that of adding an element of certainty to the rules of jurisdiction, thus providing the parties as well as the courts a greater measure of predictability. If we do not establish workable rules with some definiteness, the courts will be burdened with a great volume of threshold litigation on the question of jurisdiction and the parties must suffer the delay in the adjudication of the substantive issues in the case.

The recognition of a defendant's domicile as the prime place of trial would not preclude the application of the doctrine of forum non conveniens, nor would it preclude the forging of rules permitting certain classes of cases to be litigated in plaintiff's forum.[20]

---

[20] Thus, for example, as suggested by von Mehren and Trautman, *supra* note 8 at 1167:

"* * * [I]n any class of cases in which the controversy arises out of conduct that is essentially multistate on the part of the defendant, and essentially local on the part of the plaintiff, an argument exists for reversing the jurisdictional preference traditionally accorded defendants."

These authors are of the opinion, however, that when the plaintiff and the defendant are both engaged in interstate commercial activities "the traditional bias in favor of the defendant should not be reversed unless the litigational considerations present are most compelling." *Id.* at 1169.

It is not necessary to decide whether the principle of allocation of jurisdiction which I have suggested is a part of constitutional doctrine limiting the power of the Legislative Assembly in its assertion of jurisdiction.[21] We can read our long-arm statute as expressing a legislative purpose to reserve to this state only that jurisdiction which any state under a federation of states could legitimately claim. Since the statute does not purport to lay down any principles by which these conflicting interests are to be correlated we may assume that the Assembly delegated to us the task of establishing workable rules for the delineation of jurisdiction of our courts over non-domiciliaries.[22]

[21] Allocation of jurisdiction by this court could be regarded as the application of constitutional principle on the theory that, by implication, the Full Faith and Credit Clause requires the fixing of the limits of jurisdiction necessary in the adjustment of the conflicting sovereign interests of the states. It has been said that "[t]he great importance of *Pennoyer v. Neff* is that it identified the test under the Full Faith and Credit Clause with the test under the Due Process Clause * * *." Kurland, *supra* note 5 at 585. It may be suggested that Pennoyer v. Neff would have been of greater importance and would have caused less confusion in the development of the law if it had identified the test under the Full Faith and Credit Clause with a test *other* than the Due Process Clause—a test having some relevance to the need for reconciling the interests of the states in their assertion of jurisdiction.

[22] "* * * Since the broad statutory language is open to diverse interpretations, the courts themselves should undertake such a balancing process in determining the scope of jurisdictional statutes." Developments in the Law—State-Court Jurisdiction, 73 Harv L Rev 909, 1002 (1960).