In re the MARRIAGE OF Petitioner:
Susan A. MALWITZ,

and

Respondent: Reginald D. Parr,

and concerning Pueblo County Child
Support Enforcement Unit.

No. 03SC439.

Supreme Court of Colorado.

Oct. 4, 2004.

Colorado Legal Services, Lynn Magalska, Pueblo, Greenberg Traurig, LLP, Naomi G. Beer, Kristi Blumhardt, Michele Stone Gardner, Denver, for Petitioner.

Holland & Hart LLP, Susannah W. Pollvogt, A. Bruce Jones, Denver, for Amicus Curiae Colorado Coalition Against Domestic Violence.

RICE, Justice.

Susan Malwitz appeals a ruling by the court of appeals reversing the trial court's finding that it had personal jurisdiction over her non-resident husband, Reginald Parr (the "Defendant"), in an action for dissolution of marriage and child support. *In re the Marriage of Malwitz*, 81 P.3d 1076 (Colo. App.2003). Because we conclude that the trial court possessed both statutory and constitutional authority to exercise jurisdiction over the Defendant, we reverse the court of appeals and remand for further proceedings consistent with this opinion.

## I. Facts and Proceedings Below

In April 2000, Malwitz petitioned the Pueblo County District Court for dissolution of marriage, seeking orders regarding parental responsibilities, child support, maintenance, and division of property and debts. After being personally served in Texas, the Defendant filed a motion to dismiss for lack of personal jurisdiction. At the trial court's hearing on the personal jurisdiction issue, Malwitz and her father testified regarding the Defendant's history of abuse and harassment, as well as her knowledge of the Defendant's prior conviction for "terroristic threats against one of his ex's and attempted kidnapping against his other daughter."

Malwitz and her father testified to the following course of events. Malwitz and the Defendant were married in Texas, by operation of common law, in November 1997. Throughout the course of their marriage, the Defendant, whom Malwitz knew to be involved in a gang, abused Malwitz both mentally and physically. For example, in March 1998, when Malwitz attempted to leave the Defendant, he had a friend step on Malwitz's head while the Defendant kicked Malwitz in the face. A few months later, when Malwitz confronted the Defendant with her suspicions that he was sexually abusing her daughter from a previous relationship, the Defendant threatened to kill Malwitz if she turned him in. Despite these threats, Malwitz left the Defendant that night and reported both the death threats and child sexual abuse to the police.[1]

Malwitz, who was pregnant with the Defendant's child when she left him in September 1998, initially moved into a friend's trailer, where the Defendant continued to harass her. First, Malwitz witnessed the Defendant in the driveway of the trailer court watching both Malwitz and her daughter. Shortly thereafter, a friend of the Defendant discovered where Malwitz worked and, within the following three days, tires on Malwitz's car were flattened on two occasions while the car was parked at her workplace. In December 1998, when Malwitz reported these incidents to the police, they advised her to move into a woman's shelter. After Malwitz moved into the shelter, the Defendant and a friend were seen carrying firearms and attempting to break into Malwitz's former home in the trailer court. Additionally, during this period of estrangement, the Defendant twice made "harassing" phone calls to Malwitz's father, who resided in Colorado. In January 1999, fearing for her life, Malwitz fled with her daughter to her father's home in Colorado, where, a few months later, she gave birth to the Defendant's child.

For purposes of determining personal jurisdiction, all factual disputes are resolved in the plaintiff's favor, taking into

---

**1.** Malwitz's suspicion regarding the sexual abuse stemmed from complaints made by the child, as well as the concerns of the child's doctor. However, the police declined to investigate the allegation of abuse of Malwitz's daughter because Malwitz had not personally witnessed the abuse. Three months later, Malwitz reported the abuse to the Texas child protective services agency, which investigated the claim but never made any formal charge against the Defendant.

consideration the "allegations set forth in the complaint as well as from evidence introduced in any hearing conducted on the matter." *Keefe v. Kirschenbaum & Kirschenbaum, P.C.,* 40 P.3d 1267, 1272 (Colo.2002). Thus, in reviewing the trial court's decision to exercise personal jurisdiction over the Defendant, we accept the trial court's factual findings regarding the Defendant's abuse of Malwitz. Here, the only evidence before the trial court consisted of Malwitz's complaint and testimony from Malwitz and her father at the hearing below. Based on that evidence, the trial court expressly found that the Defendant "perpetrated domestic violence against [Malwitz]."

Based on its factual findings, the trial court concluded that it had jurisdiction over the Defendant pursuant to section 14–5–201(5), 5 C.R.S. (2003), because the Defendant's "acts or directives" had caused Malwitz, pregnant with their child, to flee Texas and because the Defendant was aware that Malwitz's only family ties were in Colorado and therefore should have foreseen that Malwitz would flee to Colorado. The Defendant appealed, and the court of appeals reversed, finding that the trial court abused its discretion in exercising jurisdiction over the Defendant. *In re the Marriage of Malwitz,* 81 P.3d at 1079.

We granted certiorari to address whether the trial court had jurisdiction to order child support under section 14–5–201(5) based on the Defendant's acts of domestic violence, which caused Malwitz to flee to Colorado where the child was born and now resides with Malwitz. Accepting the trial court's factual findings regarding the Defendant's abuse and harassment of Malwitz, we find that the Defendant's actions were sufficient to constitute "acts or directives" that caused Malwitz to flee Texas for Colorado within the meaning of section 14–5–201(5). We further find that, under these circumstances, the exercise of personal jurisdiction over the Defendant is consistent with due process. We therefore hold that the trial court had personal jurisdiction over the Defendant for purposes of entering a child support order.

## II. Analysis

Whether a court may exercise personal jurisdiction over a non-resident defendant is a question of law, which we review de novo. *See In re the Parental Responsibilities of H.Z.G.,* 77 P.3d 848, 851 (Colo.App.2003). Specifically, in order to determine whether a Colorado court may properly exercise jurisdiction over a party, we look to whether the court has both statutory and constitutional authority to do so. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 290, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (noting that "the proper approach was to test jurisdiction against both statutory and constitutional standards"); *Archangel Diamond Corp. v. Arkhangelskgeoldobycha,* 94 P.3d 1208, 1212 (Colo.App.2004) ("After determining whether the requirements of the long-arm statute have been met, the court must separately determine whether a defendant has the requisite minimum contacts to satisfy due process."). Thus, we must determine first whether the Defendant's abuse and harassment of Malwitz caused her and the child to reside in Colorado so as to make jurisdiction statutorily appropriate under section 14–5–201(5) and, second, whether exercising personal jurisdiction over the Defendant would be consistent with due process.

### A. Jurisdiction Under UIFSA

Colorado's Uniform Interstate Family Support Act (UIFSA) was enacted in order "to be used as a procedural mechanism for the establishment, modification, and enforcement of child and spousal support." *McNabb ex rel. Foshee v. McNabb,* 31 Kan. App.2d 398, 65 P.3d 1068, 1074 (2003). Adopted as the long-arm provision of UIFSA, section 14–5–201(5) provides that, "[i]n a proceeding to establish, enforce, or modify a child support order or to determine parentage," a Colorado court may exercise personal jurisdiction over a non-resident if "[t]he child resides in this state as a result of the acts or directives of the individual." Thus, jurisdiction is appropriate under UIFSA if the Defendant's abuse and harassment of Malwitz constituted "acts or directives" that caused Malwitz to reside in Colorado and, ultimately,

to give birth to the Defendant's child in this state.

Other jurisdictions have interpreted the long-arm provision of UIFSA, reaching varying results depending on the particular facts and circumstances of each case.[2] For example, in *McNabb*, the Kansas Court of Appeals refused to find personal jurisdiction over a non-resident father under UIFSA because it concluded that the child did not reside in Kansas as a result of the acts or directives of the father. In *McNabb*, the mother claimed that the father drank excessively, had abused her on one occasion a year before the mother and child moved to Kansas, and had dropped the child on one occasion several months before the mother and child moved to Kansas. 65 P.3d at 1070–71. However, because the one physical incident between the father and mother occurred over a year before the mother fled and the father's drinking "did not cause [the mother] and the child to flee Virginia for Kansas," the court ruled that the father's "acts or directives" did not cause the mother and child to reside in Kansas. *Id.* at 1075. Accordingly, the court concluded that personal jurisdiction was not available under UIFSA. *Id.*

In *Windsor v. Windsor*, 45 Mass.App.Ct. 650, 700 N.E.2d 838 (1998), a Massachusetts appellate court concluded that personal jurisdiction over a non-resident father was inappropriate under UIFSA. There, the mother left the father in Florida in June 1977, gave birth to their son in Massachusetts in September 1977, and filed a complaint for divorce, including a demand for child support, nearly twenty years later, in June 1995. *Windsor*, 700 N.E.2d at 839. In her complaint, the mother alleged that the father had been guilty of "cruel and abusive treatment"

during the course of the marriage, but did not offer any specific facts or testimony to support that claim. *Id.* at 841. Thus, finding that "[n]o affidavit, testimony, or authenticated or verified document even intimates, let alone establishes, that the wife and her children were caused 'to flee' from Florida to Massachusetts as a result of any cruel and abusive acts of the husband or any 'directive' he made," the court concluded that personal jurisdiction could not be exercised under UIFSA. *Id.* at 842.

However, in *Franklin v. Virginia*, a Virginia appellate court held that UIFSA's long-arm provision authorized jurisdiction over a husband who, "[a]fter several physical altercations, ... ordered wife and the children from their home in Africa." 27 Va.App. 136, 497 S.E.2d 881, 885–86 (1998). In response to the husband's order, the wife and children fled to Virginia, which was the family's home prior to living in Africa, the point of entry for the family's return to the United States, and the location of the husband's employer's field office. *Id.* at 886. The court rejected the husband's contention that because he did not specifically direct the wife and children to move to Virginia, the Virginia courts could not exercise jurisdiction. Instead, the court noted that "[t]o allow husband to escape his support obligations merely because he failed to dictate the specific destination when he ordered his family to leave the marital home would frustrate the purpose of the legislature in enacting [UIFSA]." *Id.* Thus, focusing on the affirmative acts of the non-resident father that caused the wife and children to reside in Virginia, rather than the voluntary choices of the mother, the court concluded that personal jurisdiction was appropriate under UIFSA. *Id.* at 885–86.[3] We find that,

**2.** Our court of appeals addressed the jurisdictional provisions of UIFSA in *In re the Marriage of Zinke*, 967 P.2d 210 (Colo.App.1998). In *Zinke*, the court ruled that jurisdiction in Colorado over a non-resident mother was inappropriate because a Montana court had already issued a support order and, therefore, under UIFSA, the Colorado courts were precluded from exercising jurisdiction on the matter. *Id.* at 212–13; see also § 14–5–205(c), 5 C.R.S. (2003) ("If a tribunal of another state has issued a child support order pursuant to [UIFSA], or a law substantially similar to that act ... tribunals of this state shall recognize the continuing, exclusive jurisdiction

of the tribunal of the other state."). Thus, although the court in *Zinke* did note that the non-resident mother's only contact with Colorado was in consenting to the child's residing in Colorado, and that this act alone would not satisfy the "acts or directives" language of UIFSA, its resolution of the jurisdictional issue was determined by the existence of a Montana support order. *Id.* Accordingly, the *Zinke* opinion provides little guidance on the issue before us today.

**3.** The court in *Franklin* further ruled that the father's motion for visitation and petition for a

like the family in *Franklin*, the pregnant Malwitz and her daughter were effectively forced to flee Texas for Colorado by the affirmative acts of the Defendant. Although the Defendant did not specifically direct Malwitz to leave, his persistent abuse and harassment left Malwitz with little choice but to leave Texas and seek safety near her father's home in Colorado. *See Id.* (noting that the mother "made no such choice" to leave Africa, but was forced to Virginia because "[t]hey had to go somewhere").

Malwitz demonstrated to the trial court that she honestly feared for her own safety and the safety of the children, based on the Defendant's actual abuse, threats of abuse, harassment, prior convictions for similar behavior, and involvement in a gang. Although she initially attempted to remain in Texas, first at a friend's house and later in a shelter, the Defendant's menacing behavior caused Malwitz to believe that she and her children would not be safe so long as the Defendant could find them. In fact, when asked why she went to Colorado, Malwitz testified: "Because I had no other alternative. I was afraid that he would hunt me down anywhere in Texas, or his friends. In Colorado, I am a thousand miles away. I am a thousand miles safer." Based on this testimony, the trial court concluded, and we agree, that "[i]t is because of the acts of domestic violence perpetrated against [Malwitz] by [the Defendant] that [Malwitz and her son with the Defendant] presently reside in the State of Colorado."

Moreover, unlike the situations in *McNabb* and *Windsor*, very little time passed between the harassment and Malwitz's decision to move to Colorado. Thus, there is clearly a direct correlation between the Defendant's acts and Malwitz's decision to move to Colorado. Finally, the Defendant was aware that Malwitz's only family connections were in Colorado, and had even initiated contact with Malwitz's father for the purpose of further harassing and intimidating Malwitz and her family. Accordingly, we conclude that the Defendant knew or should have known that

his actions would drive Malwitz to her father's home in Colorado.

In sum, the Defendant engaged in a course of conduct designed to terrorize Malwitz and her family, essentially forcing Malwitz to seek safety in Colorado. Given these facts, we conclude that the acts of the Defendant caused Malwitz, her daughter, and, ultimately, the Defendant's child to reside in Colorado within the meaning of the long-arm provision of UIFSA. Thus, the trial court properly exercised personal jurisdiction over the Defendant pursuant to section 14–5–201(5).

### B. *Jurisdiction Consistent with Due Process*

Having determined that the trial court possessed statutory authority to exercise personal jurisdiction over the Defendant pursuant to section 14–5–201(5), we now turn to the issue of whether exercising such jurisdiction was consistent with the guarantees of due process. In order for the exercise of personal jurisdiction over a non-resident defendant to withstand constitutional scrutiny, that defendant must have purposefully established "minimum contacts" in the forum State "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Keefe*, 40 P.3d at 1270–71.

In assessing a defendant's contacts, we consider whether the "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen*, 444 U.S. at 297 100 S.Ct. 559. In some circumstances, even a single act may subject a defendant to jurisdiction, where that act creates a substantial connection between the defendant and the forum state. *See Burger King*, 471 U.S. at 475–76 n. 18, 105 S.Ct. 2174; *Keefe*, 40 P.3d at 1271.

---

rule to show cause, combined with his acts of driving his family out of their home in Africa,

satisfied the minimum contacts test for personal jurisdiction. 497 S.E.2d at 886 n. 5.

Where personal jurisdiction is asserted based on a single contact or transaction, we have established the following three-prong test to determine whether the requisite minimum contacts are present:

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or of *causing important consequences* in that state. Second, the cause of action must arise from the consequences in the forum state of the defendant's activities. Finally, the activities of the defendant or the consequences of those activities must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Van Schaack & Co. v. Dist. Ct.*, 189 Colo. 145, 147, 538 P.2d 425, 426 (1975) (quoting *State ex rel. White Lumber Sales, Inc. v. Sulmonetti*, 252 Or. 121, 448 P.2d 571, 574 (1968)) (emphasis added); *see also Panos Inv. Co. v. Dist. Ct.*, 662 P.2d 180, 181 (Colo. 1983).[4]

 Even where a plaintiff has made a showing of minimum contacts between the defendant and the forum state, we must further ensure that the "assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Keefe*, 40 P.3d at 1271 (quoting *International Shoe*, 326 U.S. at 316, 66 S.Ct. 154). In resolving that issue, we consider: the burden on the defendant of litigating in a foreign jurisdiction; the plaintiff's interest in obtaining convenient and effective relief; the interest of the forum state in adjudicating disputes and vindicating the rights of its citizens; the interstate judicial system's interest in the efficient resolution of controversies; and the shared interest of the

several states in furthering fundamental social policies. *See World-Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. 559. Indeed, where these considerations are strongest, we may find that jurisdiction is reasonable "upon a lesser showing of minimum contacts than would otherwise be required." *Keefe*, 40 P.3d at 1271–72; *see also Burger King*, 471 U.S. at 477, 105 S.Ct. 2174. Finally, we stress that these principles are "not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present." *Kulko v.Super. Ct.*, 436 U.S. 84, 92, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978).

Applying the above principles to the instant case, we find that the trial court properly exercised personal jurisdiction over the Defendant because the Defendant did have minimum contacts with the state of Colorado and because the exercise of personal jurisdiction is consistent with the interests of "fair play and substantial justice" under these circumstances.

First, applying the three-prong test set forth above, we conclude that the Defendant established minimum contacts with the state of Colorado based on his abuse and harassment of Malwitz, including his calls to her father in Colorado. The Defendant's purposeful actions caused Malwitz to reside in Colorado, where Malwitz, her daughter, and the Defendant's child are currently receiving public assistance from the state of Colorado, which we deem to be an important consequence. *Cf. In re the Parental Responsibilities of H.Z.G.*, 77 P.3d at 852 (holding that a father's letter, written to assist a mother and child in receiving assistance in Colorado,

---

**4.** Our previous "single contact" cases have focused on "the transaction of any business within this state" under Colorado's long-arm statute, located at section 13–1–124(1)(a), 5 C.R.S.2003. *See, e.g., Panos Inv.*, 662 P.2d at 182–83 (upholding the exercise of jurisdiction over a foreign investment company based upon its issuance of a guarantee for a promissory note payable in Colorado); *Van Schaack*, 189 Colo. at 147, 538 P.2d at 426 (upholding the exercise of jurisdiction over a foreign bank based on its issuance of a letter of credit to a purchaser in Colorado). However, both section 13–1–124 and section 14–5–201(5) were intended to extend the scope of personal jurisdiction of Colorado's courts as

broad as constitutionally permissible. *See In re the Marriage of Zinke*, 967 P.2d at 212 (noting that the long-arm provision of UIFSA "was intended to be as broad as constitutionally permitted"); *In re the Marriage of Ness*, 759 P.2d 844, 845 (Colo.App.1988) (stating that section 13–1–124(1) "was adopted by the General Assembly to extend the personal jurisdiction of Colorado's courts to their maximum limits permissible under the United States and Colorado Constitutions"). Thus, we find this single transaction test to be equally appropriate in a case such as the instant one, where the defendant's direct contacts with the state are minimal, but the consequences caused are great.

caused the creation of a debt in Colorado, which supported jurisdiction under the "transaction of business" test pursuant to section 13–1–124(1)). Second, this action for child support and maintenance clearly arises from the consequences of the Defendant's purposeful activities of abuse and harassment because, but for that conduct, Malwitz would not have fled to Colorado and sought court intervention in order to obtain child support from the Defendant.

Finally, the Defendant's purposeful abuse and harassment, and the consequences it directly caused in Colorado, have created a sufficiently substantial connection between the Defendant and Colorado to make exercise of personal jurisdiction over the Defendant reasonable. In particular, we find that Malwitz and her child's residence in Colorado, where they are dependent on public assistance to live, is evidence of a substantial connection between the Defendant and Colorado and that this connection makes jurisdiction reasonable because it is the product not of Malwitz's voluntary choice, but of the Defendant's purposeful, affirmative acts. Moreover, the trial court concluded, and we agree, that the Defendant knew that Malwitz's sole family ties were in Colorado. This knowledge, particularly as evidenced by his phone calls to her father in Colorado during the estrangement period, demonstrates that the Defendant should have foreseen that Malwitz would move to Colorado and, therefore, should have "reasonably anticipate[d] being haled into court" in Colorado. *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559. In sum, we find that by abusing and harassing Malwitz and her family, both through his behavior in Texas and his phone calls to Colorado, the Defendant has established minimum contacts with Colorado sufficient to satisfy the first requirement of due process.

Turning to the second requirement of due process, we further find that the exercise of personal jurisdiction over the Defendant under these circumstances comports with "traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154. First, to the extent that litigating this action in Colorado, rather than

Texas, is inconvenient or burdensome to the Defendant, that burden is greatly outweighed by other interests at stake in this action. Certainly, both Malwitz and the Defendant's child have a strong interest in obtaining convenient and effective relief in their home state, particularly given their current financial status as dependent upon public assistance. Moreover, given that Malwitz fled Texas out of fear for her own safety, it would impose a substantial and unjust burden on Malwitz to require her to return to that state in order to litigate this action. The financial and emotional burdens on Malwitz, therefore, greatly outweigh the burden on the Defendant. Furthermore, Colorado has a very strong interest in vindicating the rights of its residents and in ensuring that its resident children receive adequate child support. *See, e.g., Kulko,* 436 U.S. at 100, 98 S.Ct. 1690 (recognizing that states have "substantial interests in protecting resident children and in facilitating child-support actions on behalf of those children"). Indeed, all states share a common interest in protecting victims of domestic abuse and providing an effective means of redress for such victims. These considerations, taken together, amply demonstrate the reasonableness of exercising jurisdiction over the Defendant, despite the somewhat limited nature of the Defendant's direct contacts with Colorado. *See Keefe,* 40 P.3d at 1271–72 ("Considerations like the burden on the defendant, the forum state's interest in adjudicating the dispute, and the plaintiff's interest in obtaining convenient and effective relief may sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.").

In sum, we conclude that the trial court's exercise of jurisdiction over the Defendant was consistent with the guarantees of due process. By abusing and harassing Malwitz, effectively forcing his wife to Colorado where she and the Defendant's child became dependent on public assistance, the Defendant caused important consequences in Colorado and thereby created a substantial connection between himself and Colorado.[5] Additional-

---

**5.** The court of appeals, in finding that the Defen- dant did not have minimum contacts with Colo-

ly, the Defendant should have expected Malwitz to flee to Colorado in particular because he knew that Colorado was the only place where she had family ties and, therefore, should have foreseen the possibility of litigation in this forum. Finally, the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice, in light of the manifest interests of Malwitz and her child, the state of Colorado, and the interstate justice system as a whole.

## III. Conclusion

We hold that the trial court properly exercised jurisdiction over the Defendant pursuant to section 14–5–201(5), the long-arm provision of UIFSA and that such jurisdiction was consistent with the requirements of due process. We therefore reverse the decision of the court of appeals and remand this case to the court of appeals with instructions to remand to the trial court for proceedings consistent with this opinion.

Justice COATS dissents, Justice MARTINEZ and Justice BENDER join in the dissent.

Justice COATS, dissenting.

Although it is important for Social Services to be able to recover child support costs from fathers, even if they are not residents of Colorado, I do not believe that this cause is furthered by making important decisions about an alleged father's past behavior and future responsibilities without having him legitimately before the court. Such a failure in

personal jurisdiction is fundamentally unfair and may result in unreliable determinations. Because I believe the majority's jurisdictional analysis cannot be squared with the due process requirements of the federal and state constitutions, I respectfully dissent.

The question whether sufficient contacts exist with a forum state for it to exercise personal jurisdiction over an absentee respondent is admittedly a flexible and highly fact-specific inquiry. *Kulko v. Superior Court,* 436 U.S. 84, 92, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978). It has, in fact, been characterized as "more an art than a science." *Keefe v. Kirschenbaum & Kirschenbaum, P.C.,* 40 P.3d 1267, 1272 (Colo.2002) (citing *Sawtelle v. Farrell,* 70 F.3d 1381, 1388 (1st Cir.1995)). Nonetheless, due process of law remains a fundamental requirement.

In order to subject himself to the jurisdiction of a particular state, an absentee respondent must, at the very least, have done something to purposefully avail himself of the benefits and protections of that state's laws. *Kulko,* 436 U.S. at 94, 98 S.Ct. 1690 (citing *Shaffer v. Heitner,* 433 U.S. 186, 216, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). Although a single act, not even involving personal presence in the state, may be sufficient to support personal jurisdiction for a specific purpose, it must nevertheless be "such that [the respondent] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. et al. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). It is this "purposeful availment" requirement that ensures that a respondent

rado to satisfy due process, relied heavily on the Supreme Court's *Kulko* decision. In *Kulko,* the Supreme Court concluded that a non-resident father's act of allowing his children to move to California to live with their mother, despite a pre-existing separation agreement providing that the children would reside with the father in New York, did not satisfy minimum contacts. 436 U.S. at 94, 98 S.Ct. 1690. The court noted that a "father who agrees, in the interests of family harmony and his children's preferences, to allow them to spend more time in California than was required under a separation agreement can hardly be said to have 'purposefully availed himself' of the 'benefits and protections' of California's laws." *Id.* Indeed, the Court observed that the father's single act of acquiescence "is surely not one that a reasonable parent would expect to result in the substantial financial burden and

personal strain of litigating a child-support suit in a forum 3,000 miles away," and therefore the father did not reasonably anticipate being haled before a court in California. *Id.* at 97–98, 98 S.Ct. 1690. We find that the facts of *Kulko* are readily distinguishable from the instant case. Unlike the father in *Kulko,* the Defendant did not passively acquiesce to his wife's decision to move to Colorado while she was pregnant with his child, but instead actively drove her to this state through persistent abuse and harassment. Accordingly, it is not Malwitz's unilateral action which is causing the Defendant to be haled before a Colorado court, but the Defendant's own conduct, which created a substantial connection between himself and Colorado and necessitated the involvement of our courts. Given these facts, we find the court of appeals' reliance on *Kulko* to be misplaced.

will not be haled into a jurisdiction solely as a result of random or fortuitous contacts or the unilateral activity of a third party. *Kirschenbaum*, 40 P.3d at 1271; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 n. 17, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (passive activity of a mere customer within a state is insufficient to confer jurisdiction); *Keeton v. Hustler Magazine*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *World–Wide Volkswagen Corp.*, 444 U.S. at 299, 100 S.Ct. 559 (a finding that a product can be transported to and used in a state is too tenuous a connection).

By focusing solely on the effects or "consequences" of the respondent's alleged conduct, quite apart from any "purposeful availment" on his part, the majority shifts the inquiry from one concerning the respondent's intentionality or reasonable anticipation, to one of mere causation. *Compare* maj. op. at 63 *with* maj. op. at 62, *and Van Schaack & Co. v. District Court*, 189 Colo. 145, 147, 538 P.2d 425, 425 (1975). The majority's inquiry is concerned even with causation only in the sense that another free moral agent was motivated by the respondent's abusive conduct to flee to this state in order to get away from him—an act that was clearly against his wishes and directives. As reasonable and as predictable as the mother's choice may have been, it provides no less tenuous a connection between the alleged father and this state than the connection between a car seller and a state through which the buyer drives the car en route to his home. *See World–Wide Volkswagen Corp.*, 444 U.S. at 299, 100 S.Ct. 559.

In my view, the phrase "acts or directives," as it appears in the Uniform Interstate Family Support Act, section 14–5–201(5), 5 C.R.S. (2003), can withstand constitutional scrutiny only to the extent that it intends no more than verbal directives and acts in the nature of, or in furtherance of, such directives. Reading these words broadly, as the majority does, to extend the state's jurisdiction to cover virtually anyone who does an act that,

in some sense, results in his child's residing in this state violates well-established precepts of fundamental fairness and due process of law and, by contrast with the holding of *International Shoe*,[1] actually would "heral[d] the eventual demise of all restrictions on the personal jurisdiction of state courts," *Kulko*, 436 U.S. at 101, 98 S.Ct. 1690 (citing *Hanson v. Denckla*, 357 U.S. 235, 251, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)), if allowed to stand.

The UIFSA is clearly aimed at a burgeoning societal problem and justifiably seeks to extend the personal jurisdiction of a child's home state over a non-resident parent as far as constitutionally permitted. However, as I believe its attempts to distinguish previous applications of the statute make clear, the majority is extending personal jurisdiction well beyond any previous construction. Even the Virginia court, upon which the majority heavily relies, found only that the father's specific orders for his wife and child to leave the marital home in Africa, combined with his motion for visitation and petition for a rule to show cause in the state of the previous family home, to which his wife and child had returned, amounted to sufficient contact. *See Franklin v. Virginia*, 27 Va. App. 136, 497 S.E.2d 881, 887 (1998).

Here, the allegations and testimony of the mother suggest no such directive acts or purposeful contact. The child's mother claimed merely that her less-than-one-year cohabitation with the respondent in Texas amounted to a common-law marriage; that his abusive conduct forced her to flee the marital home; that after leaving the respondent, she discovered that she had very recently become pregnant by him; that several phone calls, made before she even returned to Colorado, evidenced the respondent's awareness that her father lived in Pueblo; and that the respondent's stalking behavior forced her to flee Texas for her father's home in Colorado. The mother delivered the child in this state almost eight months, by her own account, after separating from the respondent. More than a year later, after seeking public assistance, she petitioned for

---

1. *International Shoe Co. v. Washington*, 326 U.S. 310, 317, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

dissolution of the marriage and for child support.[2]

In the absence of more than a special appearance by respondent's counsel to contest personal jurisdiction, the existence of the marriage, the paternity of the child, and the propriety of the child-support order rested entirely upon the credibility of the mother. Accepting as true all of the mother's allegations, the respondent never attempted to do business in this state; never directed or acquiesced in the child's presence in this state; and never personally set foot inside this state. Inconvenient as they may be, legitimate ways do exist for this state to establish the parentage of the child and have child-support obligations imposed upon the father, without haling the respondent into the courts of this state in the absence of purposefully availing himself of the benefits and protections of its laws. And even if they did not, granting a monetary award against the respondent in absentia would be no less unacceptable.

I would therefore affirm the judgment of the court of appeals.

I am authorized to state that Justice MARTINEZ and Justice BENDER join in this dissent.

---

**2.** In this state, the conception of a child during the course of a marriage creates a presumption of paternity. *See* § 19–4–105(1)(a), 6 C.R.S. (2003).